WILLIAM G. PARK et al.

*v.*

THE GRANT LOCOMOTIVE WORKS et al.

1. When the power of the directors of a corporation is unrestrained, either by law or contract, they may make any disposition of the profits of its business which they deem judicious.

2. If, however, the directors of a corporation accept office under a contract regulating the disposition of the profits of its business, they must, in that case, dispose of them as the contract directs.

3. The directors of a corporation have power to make any contract which may be necessary, or fit and proper to enable the corporation to accomplish the purposes of its creation.

4. The question of the expediency of making any particular contract, which is within the power of the corporation, is committed to the judgment of its managers, and so long as they act in good faith, with honest motives and for honest ends, their acts are valid and conclude the corporation.

5. The words "net profits" mean what shall remain as the clear gains of any business venture, after deducting the capital invested in the business, the expenses incurred in its conduct and the losses sustained in its prosecution.

On final hearing on bill and answer and proofs taken in open court.

*Mr. John R. Emery,* for complainants.

*Mr. George H. Forster,* of New York city, and *Mr. Benjamin Williamson,* for defendants.

VAN FLEET, V. C.

This suit is brought by the complainants, as stockholders of the Grant Locomotive Works, to compel the payment of a further or greater dividend than that which the directors of the corporation have declared. The complainants sue not only for themselves, but for all other stockholders standing in the same right that they do.

Park *v.* Grant Locomotive Works.

In February, 1875, a suit was commenced in this court against the Grant Locomotive Works, to wind it up as an insolvent corporation. A receiver was appointed, and the corporation enjoined from exercising any of its powers. The debts of the corporation, at that time, far exceeded, in amount, the value of its assets. There can be no doubt that it was hopelessly insolvent. Some of its creditors were secured by mortgage and others were merely simple contract creditors. In June, 1875, an agreement, in writing, was made by all persons having an interest in the corporation, either as creditors or stockholders, the design of which was to restore to the corporation the property then in the hands of the receiver, in order that it might be enabled to resume its business. The agreement provides, first, for the clearing of the property of the corporation from encumbrances, by the cancellation of the mortgages thereon; and, secondly, that its creditors, both secured and unsecured, shall receive stock in payment of their debts. No new stock was to be issued, but the stock already issued, and then held by the stockholders of the corporation, was to be assigned to the creditors, subject to a condition which will hereafter appear. The stock thus to be assigned consisted of three thousand shares, of $100 each, making a total of $300,000. The fourth and fifth paragraphs of the agreement were intended to define the rights of the general or unsecured creditors after they became stockholders, and the questions now in dispute grow, mainly, out of their provisions. The following is their language:

"*Fourth.* That each certificate of stock assigned to each general creditor shall be stamped on its face: 'This certificate of stock is held as security for the payment of $———, without interest, and is to be assigned to David B. Grant on the payment of the above amount.' All dividends paid on this stock shall be credited to account of such payment and endorsed thereon.

"*Fifth.* That all the net profits of the company, after the payment of taxes, insurance and the necessary amount for the proper maintenance of the property of the company in its present condition and capacity, shall be divided annually among the stockholders."

This agreement was subsequently brought to the attention of the court by petition, and the court, on the application of all

parties in interest, by decree, on the 14th day of June, 1875, directed the receiver to surrender to the corporation the property in his possession; that the franchises and privileges of the corporation be restored to it, and that the receiver be discharged from further duty under the order appointing him. This decree was carried into effect. The corporation took possession of the property and resumed its powers, and on the 1st of July, 1875, commenced business again. The complainants' debt against the corporation slightly exceeded $59,000, and they received, as the quota of stock to which they were entitled under the agreement, two hundred and three shares. The assets of the corporation were worth, on the 1st day of July, 1875, according to a valuation then made by its officers, $600,000, divided as follows:

| | |
|---|---:|
| Real estate......................................................... | $30,000 |
| Buildings............................................................ | 110,000 |
| Machinery.......................................................... | 160,000 |
| Merchandise....................................................... | 225,000 |
| Debts due........................................................... | 75,000 |

The fairness of this valuation seems to have been assented to by all parties. This is made manifest by the fact that a valuation of the property of the corporation is, by the agreement, made the standard by which the net profits were to be ascertained. The agreement, it will be remembered, provides that all the net profits, after the payment of taxes and insurance, "and the necessary amount for the proper maintenance of the property of the company in its present condition and capacity," shall be divided annually. It is obvious that it would be impossible to ascertain, with certainty, what the net gains of any business were, at any time during its progress, where the thing put in as capital consisted of merchandise, or something else than money, unless the money value of the thing contributed as capital was fixed definitely, at the very outset of the business. In view of the provisions of the agreement, I regard it as entirely clear that the valuation made by the officers was made for the purpose of fixing, definitely and unalterably, the amount

of the capital of the corporation. There is no dispute that their valuation was just and fair. The net profits must therefore be calculated on the basis or by the standard thus prescribed.

No division of net profits was made until February 12th, 1883. On that day the directors declared a dividend of twelve per cent. The sum thus distributed, in its aggregate, amounted to $104,714. The directors, about the 1st of January, 1883, caused a balance-sheet to be made up, showing the financial condition of the corporation on the 31st day of December, 1882, and sent copies of it to the stockholders. According to this statement the net profits realized up to December 31st, 1882, exceeded, by nearly two-thirds, the sum which the directors ordered to be distributed, in dividends, on the 12th of February, 1883. The net profits shown on the face of this statement or balance-sheet are a little over $260,000, but the complainants contend that they are, in truth, $50,100 more, and that their actual amount is $310,100. The value of the assets of the corporation, as given in this statement or balance-sheet, is $50,100 less than the sum at which they were estimated by the officers of the corporation on the 1st of July, 1875, and thus the net profits are made just $50,100 less than they would have been if the assets had been put down at the same valuation that they were given on the 1st of July, 1875. The change was made in this way: The value of the buildings and machinery was reduced; the buildings $22,000, and the machinery $32,000, total, $54,000, and the value of the real estate was increased $3,900, making the difference $50,100.

The complainants insist that this reduction was wrongful as to the stockholders, and that the court should, on the facts before it, declare that the amount of the net profits divisible under the agreement, in the year 1883, was $310,000. The decision of this question must be controlled by the contract. The subject is one that it was competent for the parties to regulate by contract. The contract unquestionably imposes very important limitations upon the power of the directors. In cases where the power of the directors of a corporation is without limitation, and free from restraint, they are at liberty to exercise a very liberal discretion as to what disposition shall be made of the gains of the business

of the corporation. Their power over them is absolute so long as they act in the exercise of an honest judgment. They may reserve of them whatever their judgment approves as necessary or judicious for repairs and improvements, and to meet contingencies, both present and prospective. And their determination in respect to these matters, if made in good faith and for honest ends, though the result may show that it was injudicious, is final, and not subject to judicial revision. But the directors of this corporation have no such power. The contract takes it from them. The disposition of the net profits is not to be governed by the discretion or judgment of the directors, but by the rule prescribed by the contract. The contract prescribes the standard by which the rights of the stockholders to the profits are to be measured, and the directors, in disposing of them, have no right of judgment, but must perform their contract obligations. The purposes to which the net profits must be applied are limited and defined by the contract; they are to be used to pay taxes and insurance, and to keep the works of the corporation in the condition and up to the capacity they had on the 1st of July, 1875, and the balance must be distributed to the stockholders. The obligation created by the contract in this respect is plain and imperative. The directors have no power and no right to apply them to any other purpose, and if they should do so they would violate their contract. No part of them can be reserved to be employed as working capital. The stockholders have already contributed all the means for that purpose that their obligation requires them to furnish. The $50,100 in question were not reserved to be expended in repairs and improvements, in order to put the works of the corporation in the condition, and bring them up to the capacity they had in July, 1875. Had the directors set apart a fund out of the net profits to be used for those purposes, it is quite evident, I think, that their action, in that regard, would have been within the fair scope of their power. The amount necessary to be expended in any year for such purposes, I suppose, can never be fixed in advance with anything like certainty or precision, and the contract should, therefore, be construed as having submitted the decision of that

question, to a very large extent, to the discretion of the directors. It may not be entirely accurate to say that any action taken by the directors on this subject, in good faith, would conclude the stockholders, and wholly exclude judicial inquiry as to whether or not their action had violated the contract, yet this, I think, may be safely said, that if a court should be called upon to review the action of the directors in that regard, it would be bound, in deciding the question whether the contract had been violated or not, to adopt the same standard of judgment as that which should have governed the action of the directors, and not to adjudge that the contract had been violated, unless it was made clearly to appear that the stockholders had been deprived of some right plainly secured to them by the contract.

There is nothing, however, in the action of the directors which gives either pledge or indication that the $50,100 will be appropriated for purposes authorized by the contract. The book of minutes of the corporation contains no record of their action. All they have done is to mark down the value of the buildings and machinery. This was done, they say, because they believed that seven years' wear and tear had depreciated them to the extent that their value was reduced, but the proofs show that, during that period, nearly $100,000 had been expended in their maintenance. It is manifest, I think, that the stockholders have a right, under the agreement, to have this matter dealt with in a manner very different from that in which it would appear it has been dealt with. If the buildings or machinery are out of repair, or need to be renewed, so that some part of the net profits must be expended to put the works of the corporation in the condition and to raise them to the capacity they had in July, 1875, the stockholders have a right to have the judgment of the directors as to how much shall be expended for each of those purposes, and if net profits are reserved, they also have a right to know for what purpose they are reserved, in order that, if the purpose is one not authorized by the contract, they may challenge the action of the directors, and if it is, that they may know how the net profits have been disposed of. Although there is no express provision of the contract so declaring, yet I think, when

the contract is examined with a view of ascertaining what were the principal objects of the parties, there can be little doubt that one of them was that the works of the corporation should be constantly kept up to the capacity they had in July, 1875. On that part of the contract being fully performed rested the main hope that either its present or ultimate purpose would be accomplished. And I regard it as entirely clear that the stockholders have a right to have that part of the contract faithfully kept. On the case as it now stands, the complainants are, in my judgment, entitled to a declaration that the amount of net profits, shown by the balance-sheet of December 31st, 1882, was $310,000, and that the reduction made in the valuation of the buildings and machinery was erroneous.

The remaining and more important question is, Were the stockholders entitled under the contract to a larger dividend in 1883 than that which the directors declared? They distributed nearly $105,000. This left of the $310,000 nearly $205,000. If this balance consisted of money, or of securities which could easily and readily be converted without loss, there can be no doubt that the directors were bound by the contract to divide it. The proofs show that, on December 31st, 1882, the corporation held railroad securities, consisting of notes and bonds, which had been taken in payment for locomotives, for a little over $212,000. They had been taken at par. These were, of course, included in the statement of December 31st, 1882, and represented in part the sum shown on that statement to be net profits. None of them were then due, and none became due until February 10th, 1883. After that date portions of some of them fell due every month, and portions of others every quarter. The one having the longest period to run will not mature until January 1st, 1888. The securities were not sold at the New York stock exchange and had no market value. The proof is that they were absolutely unsalable. They were taken, as already stated, in payment for locomotives. The corporation was created for the purpose of manufacturing and selling locomotive engines and other machinery. The contract under which the corporation resumed business imposes no limitation upon the power of the directors

Park *v.* Grant Locomotive Works.

to make contracts in carrying on its business.   Their authority, in that respect, is full and complete. They are competent to make any contract which may be necessary or fit and proper to enable the corporation to accomplish the purposes of its creation. *Ang. & A. on Corp.* § *256 ; Field on Corp.* § *746.*   The question of the expediency of making a contract, which is within the capacity of the corporation, is committed absolutely to the judgment of its managers, by whom alone it can act, and so long as they keep within the power conferred upon the corporation, and act in good faith, with honest motives and for honest ends, their contracts are valid, and conclude the proprietors of the corporation. *Elkins* v. *Camden and Atlantic R. R. Co., 9 Stew. Eq. 241.*   It would seem, therefore, to be entirely clear that the directors, in accepting these securities in payment for locomotives, did nothing which was not clearly within the power committed to them.   The true statement of the case, then, would seem to be this, profits have been made, provided the securities which the directors have rightfully taken in the proper prosecution of the business of the corporation, are paid, or can be collected, but not otherwise.   If it should turn out that part of the securities can be collected, and part cannot, or cannot otherwise be converted, the part not paid or converted will, in no sense, be entitled to be regarded as profits.

The words "net profits" define themselves.   They mean what shall remain, as the clear gains of any business venture, after deducting the capital invested in the business, the expenses incurred in its conduct, and the losses sustained in its prosecution. If, as in this case, merchandise is sold and securities payable at a future day are taken in payment, it is entirely proper—nay, if accuracy is desired, it is indispensable—that in making a statement of the condition of the business, the securities should be put down as part of its assets, and they must, as a general rule, if the statement shows that profits have been made, represent the profits either wholly or in part.   And if, subsequently, in attempting to collect them, losses are sustained or expenses incurred, the sum shown as profits will be reduced just to the extent of such loss or expense.   Now, the agreement in this case

Park *v.* Grant Locomotive Works.

requires that the net profits shall be distributed annually to the stockholders, but it is quite obvious, I think, that what the parties meant by the words " net profits," as here used, was not the whole sum appearing as net profits on any annual statement, if such sum represented securities taken by the corporation in the ordinary course of its business, which were not yet due, and which could not be converted, except at a price much less than that which the corporation had given for them, but what they meant was net gains which had been actually realized, or which could be quickly realized without loss by a sale of the assets representing the profits.

Two fundamental objects are apparent on the face of the contract. They are, first, that the creditors who hold the stock of the corporation as security for their debts shall be paid out of the net profits of its business ; and, second, that the persons who assigned their stock as security for the debts of the corporation, shall, as soon as the debts are paid, have their stock returned to them. The directors are bound, in conducting the business of the corporation, to have regard to both of these objects, and, if possible, so to manage its affairs that both may be ultimately accomplished. If the directors were to attempt to sell the securities of the corporation, which they had taken at par, and which were maturing at short dates and at frequent intervals, at merely nominal prices, or at prices far below their face value, they would attempt to do what, in my judgment, would constitute a flagrant breach of duty against both classes of *cestuis que trust*— both those who have the present interest, and those who have a prospect of having an ultimate interest. To divide the securities in kind is an impossibility. The only other method open, then, is by a sale of them, and that, according to the proofs, is also an impossibility, or, if not, it can only be effected at a loss which would be ruinous to all concerned. My conclusion is that the complainants were not entitled to a greater dividend in 1883 than that which the directors declared.