ALFRED F. STEVENS

*v.*

UNITED STATES STEEL CORPORATION.

[Filed January 17th, 1905.]

1. In a suit to compel the declaration of a dividend on stock of a corporation, the corporation is a necessary defendant. The question whether the directors ought to have been made defendants is not raised by a demurrer to the bill for "want of equity."

2. In the absence of statutory provisions, the granting of dividends from profits is in the discretion of directors of trading corporations, subject to the intervention of equity for improper refusal.

3. The Corporation act, as amended (*P. L. 1901 p. 247 § 47*), permits corporations, in the manner specified, to regulate the whole matter of the distribution of profits by dividends to stockholders; the statute prescribes the time, manner and extent of such distribution, but only in the absence of inconsistent regulations made by the corporation itself in accordance with the statutory requirement; the view that the statutory rule is rigid, except that the corporation, in the manner prescribed, may change the date of distribution, held erroneous.

4. Directors are not required to declare dividends on common stock, as well as on preferred stock, at a time when there are profits enough therefor, where it is not for the interest of the corporation, though such profits may otherwise be absorbed in future dividends on the preferred stock.

On demurrer to bill.

*Mr. Richard V. Lindabury,* for the demurrant.

*Mr. Alfred F. Stevens, pro se, contra.*

STEVENSON, V. C.

The complainant, as the holder of thirty shares of the common stock of the defendant corporation, files his bill, on behalf of himself and other stockholders who may come into the suit, to compel the declaration of a dividend upon the common stock out of an alleged accumulation of profits amounting, in January, 1904, to sixty-six million dollars ($66,000,000). The entire capital stock consists of eleven million shares of one hundred dollars ($100) each, divided equally between preferred and common stock. Dividends have been paid from the organization of the company, in April, 1901, upon this entire stock of both classes, until January, 1904, the time for the regular declaration of a dividend on the common stock. Notwithstanding the above-mentioned accumulation of profits at that time, after duly caring for the dividend on the preferred stock, the dividend on the common stock was passed.

The demurrer is general in form, specifying as its sole ground the objection which usually is called, in brief, "want of equity."

1. The defendant makes the preliminary objection that the directors of the corporation are the proper parties to such a suit as this, and that the corporation itself is not a proper party, or, at any rate, is not a proper party defendant.

Notwithstanding some *dicta,* and possibly some decisions, in other states, to sustain the proposition that in a suit to compel the declaration of a dividend the corporation stands as a complainant rather than as a defendant, and the directors of the corporation are necessary defendants, I think it is plain, upon principle and upon authority in this state, that in every such suit the corporation is a necessary party defendant. It is difficult to see how the corporation, practically, could appear as complainant in such a suit if the directors who control the corporation are the defendants.

Until a dividend is declared the entire assets of the corporation, including surplus or accumulated profits in whatever form they exist, belong to the corporation, and the corporation owes no debt in respect thereto to the stockholders as individuals. *2 Cook Corp. § 534.* When, however, a dividend has been declared a debt at once becomes due from the corporation to each stockholder, recoverable by each in a separate action at law. *Jackson's Administrators* v. *Newark Plank Road Co., 31 N. J. Law (2 Vr.) 277 (1865)* ; *King* v. *Paterson, &c., Railroad Co., 29 N. J. Law (5 Dutch.) 504 (1861).*

A suit in a court of equity to fasten upon a corporation a debt to its stockholders which theretofore has not existed is instituted for the benefit of the stockholders severally as individuals, and if defended will naturally be defended by the corporation as representing the interests of the stockholders as a body corporate in the prosecution of the corporate business, for which the assets are held, and which may be injuriously interfered with by any diminution of the assets.

The precedents in this state uniformly indicate that in such a suit the corporation is a proper party defendant. *Laurel Springs Land Co.* v. *Fougeray, 50 N. J. Eq. (5 Dick.) 756 (1893)* ; *Griffing* v. *Griffing Iron Co., 61 N. J. Eq. (16 Dick.) 269 (1901).* In the case of *Trimble* v. *American Sugar Refining Co., 61 N. J. Eq. (16 Dick.) 340 (1901),* although the demurrer to the bill was sustained, the learned vice-chancellor (Pitney), in his opinion, does not suggest that the suit was improperly brought against the corporation as the sole party defendant.

The doctrine that directors are the trustees for stockholders,

in my judgment, does not control a case like this. That principle is often recognized where directors are violating their duty to the injury of the stockholders as a corporate body. The corporation is not injured by the retention of profits among its assets, which might be distributed and thus become the private, separate property of the stockholders. On the contrary, the corporation is enriched. The object of this suit is not to compel directors to do or refrain from doing something for the benefit of the corporation, but to do something for the benefit of the complaining stockholder which may be disadvantageous to the corporation.

To compel a stockholder in a case like this to make only the directors defendants would not only be contrary to principle, but would result, oftentimes, in difficult complications. The directors of the corporation might be wholly changed during the pendency of the suit. Directors often change during the progress of suits against corporations, the object of which is to fasten a liability upon a corporation by a decree of the court, which liability must be discharged by an application of the corporate assets. When the final decree has established such a liability, it becomes the duty of the board of directors in office at the time when such decree is rendered to take such action as may be necessary in order that the corporation may perform the duty imposed upon it by the decree.

The defendant has not assigned as a cause of demurrer the absence of the directors as necessary parties. At the final hearing the court, of its own motion, may arrest all proceedings in this cause until other parties shall be brought in if justice calls for such action, but it does not follow that if such result will inevitably ensue this demurrer, based on an alleged want of equity alone, should be sustained. If the demurrer had objected to the omission of the directors as parties defendant, the complainant would have had an opportunity to amend his bill before proceeding to the elaborate argument upon the merits which now has been had.

I think the true rule is that if this bill presents any case of equitable cognizance against the defendant, the United States Steel Corporation, on behalf of the complainant, the demurrer

should be overruled unless a final decree in favor of the complainant would be practically of no value to the complainant. If upon the final hearing it appears that additional parties are necessary in order to satisfy and completely dispose of the controversy in this cause, such additional parties may then be brought in. *McLaughlin* v. *Van Keuren,* *21 N. J. Eq.* (*6 C. E. Gr.*) *379* (*1869*) ; *Wood* v. *Stover's Administrators,* *28 N. J. Eq.* (*1 Stew.*) *248* (*1877*).

At present, under the form of this demurrer, it is not necessary to decide the question whether the directors of the defendant corporation ought to have been joined as parties defendant. It is enough to reach the conclusion that a final decree in this suit between this complainant and this defendant will settle an issue between them of great importance and ascertain and finally determine a right belonging to the successful party of very great value. Such final decree will make it *res adjudicata* between these parties whether or not a dividend on the common stock ought to be declared. I am unable to perceive any reason why this very important controversy cannot be completely and finally disposed of between these parties now before the court without injuriously affecting in the slightest degree the rights of any unrepresented party.

2. The bill presents no case apart from our statute (Corporation act, section 47), in which, under the general equity power of this court, the complainant is entitled to have a dividend declared on the common stock of the defendant corporation.

The general rule is well settled that the directors of trading corporations are invested with a wide discretionary power in regard to the distribution of profits in the form of dividends among the stockholders. Subject, of course, to provisions in the charter, and also to the by-laws of the company, it is for the directors to say whether profits shall be distributed to the stockholders or retained for the purpose of the corporate business. It is, however, equally well settled that this discretionary power is not absolute, and when the directors "improperly refuse to make a division of unused profits," a court of equity will intervene on behalf of any stockholder who may complain. *Laurel Springs Land Co.* v. *Fougeray, 50 N. J. Eq.* (*5 Dick.*) *756, 759,*

760 (1893); Fougeray v. Cord, 50 N. J. Eq. (5 Dick.) 185, 197 (1892); Griffing v. Griffing Iron Co., 61 N. J. Eq. (16 Dick.) 269, 271; 2 Cook Corp. (4th ed.) § 545. These general principles must be kept in mind in dealing with such statutes as those which a little later we are to construe. It does not follow that if the minority stockholders have not the benefit of a hard and fast statutory rule for the distribution of profits, that therefore they are exposed to permanent deprivation of dividends, and that they must wait indefinitely and accept an increasing book value of their stock in place of the cash dividends which they would prefer to enjoy. The New Jersey cases above cited, as well as many cases in other states, illustrate how ample are the powers of courts of equity to enforce the rights and satisfy the reasonable expectations of stockholders in the matter of the declaration of dividends when profits, which are not required to be retained for the purposes of the corporate business, including protection against emergencies, are unreasonably and unjustly allowed to remain undistributed.

Apart from a single argumentative allegation in this bill, which will be hereinafter particularly dealt with, there are no facts set forth which show that the complainant and his fellow-stockholders have any right whatever to compel a declaration of a dividend upon their stock, unless such right is created by a statute. The bill, however, sets forth the enormous sums of money which represent the capital of this corporation, the profits which it has distributed, and the accumulated profits which the complainant says it is wrongfully withholding from distribution. Lest fallacious inferences should be drawn from a partial consideration of these facts, it is necessary to consider them as they are exhibited in the bill somewhat in detail. The mere statement that a corporation in January, 1904—when, according to its by-laws and the statute of the state, a dividend might have been declared, if any dividend was due—was in possession of $66,-000,000 of accumulated profits would, by itself, probably create the impression in most minds that such dividend ought to have been declared. The accumulation is so enormous that, applying the ordinary standards by which we judge such things—standards derived from the experience of ordinary business men—it

would seem as if under no possible state of facts could the retention of such an immense sum of money in profits be justified. And yet this accumulation ($66,000,000) is only six per cent. upon the outstanding capital stock of the corporation, $1,100,-000,000. The allegations of the bill in regard to the payment of dividends upon the entire capital from the organization of the corporation, and the amount of those dividends, show beyond question that the corporation has been from the start in the possession of this great capital of $1,100,000,000, and indicate that such capital must have been to a large extent, if not entirely, actually invested in the corporate business, so as to produce these great gains. The total dividends distributed from the organization of the business in April, 1901, down to January, 1904, a period of two years and nine months, amount to about $160,000,000, which sum, with the undistributed surplus above mentioned, makes the total profits earned by the corporation in this brief period over two hundred and twenty million dollars ($220,000,000).

The corporate objects cover a very wide range of business activity in which manifestly enormous amounts of capital may be invested, while the business of the corporation may be prosecuted all over the world.

It is evident that no inference can be drawn in favor of the complainant's right, under general equitable principles, to have a dividend declared in January, 1904, from the mere fact that at that time the accumulated profits, after providing for the dividend on the preferred stock, amounted to $66,000,000. The situation would be precisely the same if we had before this court in this case a corporation organized for the manufacture of tinware in a country town, with an authorized and outstanding capital of $11,000, represented by fifty-five shares of preferred stock and fifty-five shares of common stock, and with an accumulation of profits amounting to $660, and with perhaps just enough cash on hand to meet the requirements of current business.

As bearing upon any possible right of the complainant to a compulsory dividend based upon general equitable principles, it should be noted that the bill does not set forth in what form the

$66,000,000 of accumulated profits existed in January, 1904. Possibly not a tenth of that amount existed as cash—as profits not only earned, but actually received, so as to be susceptible of distribution among the stockholders in the form of dividends. Possibly nine-tenths of this immense sum was tied up in manufactured products, bills and accounts receivable, or in stocks or bonds of other corporations. In order to distribute these profits in the shape of cash dividends, large loans might be necessary, which would in the future be a menace to the corporation and its credit.

It also may be observed that the bill does not state that the $66,000,000, which is alleged to be the amount of the accumulation of profits inequitably withheld from distribution in January, 1904, has ever been actually received by the corporation. In paragraph 4 the bill alleges that in January, 1904, "the surplus accumulated from the net profits of the corporation was very large, and much greater than in the year 1901, when dividends were declared," &c. In paragraph 7, however, the bill undertakes to deal specifically with the accumulation of each year, and alleges distinctly that such accumulation for the year 1901 was profits which the company had "earned," and that the accumulations of the years 1902 and 1903 were "earnings." Earned accumulated profits may be a very different thing for the purposes of distribution from accumulated profits. Earnings may be made without ever being received. See *Park* v. *Grant Locomotive Works, 40 N. J. Eq. (13 Stew.) 114.*

3. The gravamen of this bill lies in the claim that under section 47 of our Corporation act, as amended in 1901 (*P. L. 1901 p. 246*), the complainant and the other stockholders were entitled to have a dividend declared by the directors of the corporation distributing "the whole of its accumulated profits." This amended section reads as follows:

"Unless otherwise provided in the original or amended certificate of incorporation, or in a by-law adopted by a vote of at least a majority of the stockholders, the directors of every corporation created under this act shall, in January in each year, after reserving, over and above its capital stock paid in, as a working capital for said corporation, such sum, if any, as shall have been fixed by the stockholders, declare a dividend among its stockholders of the whole of its accumulated profits exceeding the amount so reserved, and pay the same to such stockholders on demand."

The bill alleges that no working capital has been fixed by the stockholders or directors of the corporation to be reserved from distribution, and insists that the statute applies to and governs the situation, and that therefore the whole of the accumulated profits, as they stood in January, 1904, ought to have been declared as a dividend upon the common stock—the dividend upon the preferred stock having been duly set apart or paid.

Whatever may be the true construction of the phrase "accumulated profits," as used in a statute providing for distribution of what almost inevitably must in every such case as this be cash, it should be observed that the bill does not employ the statutory phraseology without modifications, but distinctly alleges that the fund which it seeks to have wholly, or in part at least, distributed in dividends does not represent "accumulated profits" which have actually been received by the corporation, but only accumulated profits which have been "earned" by the corporation, and also that still more indefinite thing termed "earnings." I shall not, however, pause even to consider the effect of this peculiar phraseology of the bill in view of the scope of the argument which has been made on both sides, both orally and by briefs. I shall assume, as the argument on each side has assumed, that the bill intends to allege that in January, 1904, there was no working capital set apart by the stockholders or the directors, and there were "accumulated profits," whatever that may mean, in whatever form such profits may have existed, amounting to about $66,000,000. I shall also assume, as the argument on each side seems to assume, that whatever the meaning of the term "accumulated profits" in such a statute as this may be, a bill is sufficient as a pleading which follows the words of the statute, and alleges that "accumulated profits" in fact existed at the time when the bill claims a dividend should have been declared.

With the above assumptions in favor of the complainant, his insistment is that the first three lines of section 47, above set forth, have a qualifying force solely upon the clause "in January in each year." In other words, the mandate of the statute to declare the annual dividend cannot be affected by the certificate of incorporation, or by a by-law adopted by a majority of the stockholders, except as to the month of the year in which the

transaction is to take place. The directors are obliged to declare a dividend of the whole accumulated profits, after deducting such "sum, if any, as shall have been fixed by the stockholders" as a working capital. They are obliged to do this annually. Complainant's counsel even insists that the action of the stockholders in fixing a sum as a working capital for the corporation to be set off from its profits is an act to be performed once for all, and not an act to be performed from time to time or annually. This extreme position need not be considered in this case, inasmuch as no working capital has been fixed either by the stockholders or by the directors.

The defendant insists that the meaning of the statute is that the directors shall attend to the business of distributing the accumulated profits of the corporation according to the provisions of this statute, unless provisions are made otherwise in the certificate of incorporation or in a by-law adopted by a vote of at least a majority of the stockholders, in which case such last-mentioned provisions shall prevail. In other words, the statutory rule is to prevail except so far as the same may be displaced by a rule laid down in the certificate of incorporation or in a by-law adopted by a majority of the stockholders.

In my opinion, the defendant's view is sustained not only by the correct grammatical construction of the statutory language, but by a consideration of the history of our statute and the situations to which its provisions must be applied.

Taking the statute as it now reads, I perceive no reason for applying the whole force of the word "otherwise" to the mere date of the transaction described in the section. What possible distinction in respect of the qualifying effect of this adverb can be drawn between a provision in a certificate or in a by-law providing that the annual distribution of dividends shall take place in July, instead of January, of every year, and a similar provision directing that the distribution shall be of a portion of the accumulated profits, or that the dividend shall be payable three months after the declaration thereof and not on demand?

It is not necessary for the statute to confer upon corporations the power to regulate the matter of dividends by certificates of incorporation or by-laws. Without the express provisions of the

statute, all corporations created under it would have full power to so act, not only by their certificates and their by-laws, but by ordinary resolutions of their boards of directors. When this statute undertakes to lay down a rule prescribing the amount of dividends to be declared, the time when they are to be declared and the time when such dividends shall be payable, which rule, however, is to be applicable unless the corporation shall provide otherwise in the exercise of the discretion which the corporation would have in the absence of the statutory rule, the meaning of the statute appears to me to be free from doubt. The intention is that the statutory rule shall be the standing rule, applicable to all corporations in the absence of inconsistent rules which the corporations may see fit to pass in a certain specified way.

The history of the development of our statutory rule in regard to the declaration of corporate dividends, I think, very strongly indicates that after various legislative experiments, to which I shall refer in some detail, the intention of this last enactment of 1901 was to permit the whole matter of the distribution of profits to be regulated by the will of a majority of the stockholders, expressed in a certificate of incorporation or a by-law.

The imposition of a rigid statutory rule controlling the distribution of profits by corporations is, I think, a device of very recent times, and, so far as I am aware, is peculiar to the legislation of New Jersey. In New York, and probably in other states, special statutory rules regulating dividends have been applied occasionally to special classes of corporations. Our New Jersey rule, in its more recent forms, certainly is a novelty, and may be regarded as a legislative experiment which perhaps has not been brought to a conclusion in this last statute of 1901.

The first attempt to legislate so as to protect stockholders in respect of their reasonable expectations of dividends seems to have been made as recently as the year 1866. *P. L. 1866 p. 1034.* This first statute applied only to "*manufacturing* corporations within this state.*" Several questions as to the scope of this statute appear on its face. Down to this date, however (1866), the minority stockholder who objected to the decision of directors, who in good faith, in the interests of the corporate business, refrained from declaring dividends out of accumulated

profits, had his remedy to realize his profits by sale of his stock—apparently a more valuable remedy than the same power to sell afforded him in many other instances in which the corporate business was not transacted so as to meet with his approval. The statute of 1866 permitted the board of directors of "manufacturing" corporations to specify a sum to be reserved as a working capital not exceeding one-half of the capital stock paid or secured to be paid, and then directed the distribution of the balance of "accumulated profits" annually on the 1st day of August, "unless some other specific day for that purpose be fixed in the charter." The act of 1866 was made section 52 of the revised Corporation act of 1875, with the relaxed rule that the annual dividend day might be fixed not only by the charter but by the by-laws. *Rev. p. 186 § 52.*

In 1891 the law was amended by attaching to it a proviso to the effect that "accumulated profits," which consist in "real property" or merchandise necessarily employed in the business" of a corporation, should not be regarded as profits for the purpose of the declaration or payment of dividends, except so far as a majority of the directors or stockholders should by resolution provide. *P. L. 1891 p. 176.* This proviso seems to indicate that in 1891 the legislature regarded the provision in the former laws for setting off a working capital out of profits as an inadequate protection against the unjust demands of individual stockholders for cash, and perhaps surmised that the phrase "accumulated profits," as used in the former laws, included more than profits so completely realized as to stand as cash, or the equivalent of cash, and might be deemed to have the same meaning as the phrase "accumulated surplus." Whether "real property or merchandise necessarily employed in the business" of a corporation was capable of being set off as "working capital," within the meaning of the statutes of 1866 and 1875, perhaps, was not clear to the draughtsman of the act of 1891.

The revised Corporation act of 1896 changed the statute under consideration in some important particulars. See *Corporation act of 1896 § 47.* The law was made applicable to every corporation created under the act. This certainly was a wide extension of the scope of the act, and removed from consid-

eration the question under the former acts as to what was included in the term "manufacturing corporations." The new statute committed the power of fixing a sum to be reserved from profits as a working capital to the stockholders, but provided that the corporation, by its certificate of incorporation or its by-laws, might give the directors power to fix the amount so to be reserved. The most significant change consisted in omitting the proviso which was attached to the law of 1891. Probably the fair inference is that the revisers of 1896 considered the power given to set off working capital as adequate to protect corporations from being obliged, upon the demand of a single stockholder, to distribute profits which existed in the form of property "necessarily employed in the business" of the corporation.

In my judgment, a careful examination of the revised act of 1896 will show that the legislative experiment, in controlling the discretion of the managers of corporations in respect of the distribution of profits, was somewhat dangerous, and brought about a situation which was liable to be productive of mischief and exposed corporations to malicious and injurious attacks.

The consideration of a few of the most apparent defects in this law of 1896 strongly supports the construction which I have heretofore indicated as the proper one to be placed upon the statute of 1901. The stockholders are to fix a "sum to be reserved as a working capital." If we assume that the "sum" to be reserved need not be in the form of money, still the reservation must be made in good faith in order to provide a "working capital." The power to reserve property for a "working capital" could not be exercised merely for the purpose of preventing the declaration of a dividend. Large accumulations of profits might exist in the form of property which in no sense could be deemed working capital, but which could not be distributed without enormous loss. *Park* v. *Grant Locomotive Works, supra.*

The greatest danger to many of the largest corporations of the state, under the law of 1896, and under this law of 1901, if, as the complainant contends, the majority of the stockholders,

through a certificate or a by-law, are unable to save themselves and their corporation from such danger, arises from the use of the phrase "accumulated profits," which has come down through all these statutes from 1866.

The phrase "accumulated surplus," as used in statutes regulating the assessment of corporate property, has been defined in a series of decisions in this state. *Trenton Iron Co.* v. *Yard, 42 N. J. Law (13 Vr.) 357; Mutual Benefit Life Insurance Co.* v. *Utter, 34 N. J. Law (5 Vr.) 489.* In the latter case Mr. Justice Van Syckel, speaking for the court of errors and appeals, says (at *p. 493*) : "The term accumulated surplus, in its application to stock companies, is well understood to refer to the fund they have in excess of their capital and liabilities." .

Counsel for complainant, in his argument, as I understand it, practically insists that "accumulated profits" in this statute, providing for what must almost in every case be a distribution of cash, is the same thing as "accumulated surplus," as defined by Mr. Justice Van Syckel. If this view is correct, the danger of the large corporations of the state, under the act of 1896, must have been perfectly plain to the revisers of that act in 1901. A corporation, at the demand of a single stockholder, might be obliged to sell a large portion of its assets at a ruinous loss, or in anticipation of the sale of those assets make large loans of money, which would greatly injure its credit, in order to effect a distribution of profits which were merely exhibited on paper as the result of the action of accountants and appraisers— profits which had in fact not been realized and which might turn out never in fact to have been earned. A perfectly honest stocktaking, as of December 31st, 1903, might show that the United States Steel Corporation had an "accumulated surplus" which might also be deemed "accumulated profits" to the extent of $66,000,000. If a distribution of $66,000,000 thereupon became necessary in January, 1904, it is possible that a decline in the value of the stock on hand of the corporation, and the failure of some of its debtors, might wipe out a large part of the profits before the dividend checks had been cashed. .

Moreover, after this unfortunate situation had been created by an honest attempt to obey the law, the directors of the cor-

poration might find themselves subject to a demand, under section 30 of the Corporation act, that they personally replace in the treasury a large part of the dividends which they had distributed to the stockholders. *Appleton* v. *Malling Company, 65 N. J. Eq. (20 Dick.) 375; P. L. 1904 p. 276 § 2.* Directors, who must obey the mandate of section 47, construed according to our present supposition, and also the prohibition of section 30, as construed by the court of errors and appeals in the above-stated case, certainly seem to occupy a difficult and uncomfortable position.

. But let it be supposed that the term "accumulated profits" is to be construed as meaning something different from the term "accumulated surplus." It certainly seems reasonable to hold that the phrase "accumulated surplus," as used in a tax act dealing with the value of property at a certain date, means a widely different thing from the phrase "accumulated profits" as used in a statute providing for the distribution of profits in cash among stockholders. There seems to be great force in the argument that this series of New Jersey statutes did not attempt to foist upon a corporation an annual indebtedness to its stockholders enforceable at law and payable on demand in cash equal to the surplus or profits, or net profits, which might appear on paper as the result of the annual stocktaking.

What our statutes, I think, have tried to do has been to regulate the discretion of directors in declaring dividends by laying down a convenient rule defining a situation in which stockholders may justly claim that dividends have been "improperly" withheld. I know of no rule of equity which requires directors to sell property of the corporation at a loss, or borrow money in order to pay dividends, because an appraisement of the corporate assets exhibits a surplus or what bookkeepers might call profits.

It must be borne in mind that the statute makes any dividend which may be declared payable *on demand.* The bill of complaint, to avoid the hardship of its claim that the "net surplus, as shown by the books of the company" in January, 1904, after providing for the dividend on the preferred stock, "should have been declared as a dividend * * * to the common stockholders," concedes that such dividend should be made "payable

*at convenient dates.*" But it is plain that there is no warrant in the statute for such a provision postponing the payment of the dividend. The statute is defining a duty to pay out profits in cash on demand, and that fact strongly indicates that the statute is defining a situation in which profits exist practically as cash on hand, so as to be capable of distribution.

Counsel for complainant, anticipating that the view might not be adopted that the entire $66,000,000 of accumulated profits, according to the books of the defendant, should have been distributed in dividends to the common stockholders, argues that, at any rate, this court should hold the bill in order to ascertain the amount of "accumulated profits" which in January, 1904, were, or at the present time are, subject to distribution in dividends under a proper construction of that statutory phrase, and then order such dividend to be made. The very great difficulty of the work thus attempted to be put upon this court, and the litigations, *bona fide* and malicious, made possible if this court were obliged to perform such a work, present a forcible argument in favor of the construction which I have placed upon the act of 1901.

What are profits? How are profits to be distinguished from the assets in which they are merged until they are in some way set apart or earmarked by the corporation or its officers or directors by whom the assets are held? With large profits exhibited on the books, possibly all the cash on hand or readily obtainable, without loss, would represent capital only. In the case of this defendant corporation, it is fair to presume that the amount of capital kept on hand in the form of cash, considered absolutely, is an immense sum of money. If the statute imposes upon directors the duty to stockholders of using due diligence to realize profits in cash, so as to make distribution possible, by what rule is the amount to be so realized to be ascertained by a court? The general rule of courts of equity heretofore referred to, applicable to such a situation, might be formulated and enforced, but the question is, what is the statutory rule to determine the amount of "accumulated profits" when the difference between assets and liabilities, including the capital stock of the defendant corporation, is $66,000,000? If the statutory rule

which directs the annual distribution by a corporation of the "whole of its accumulated profits," after setting off the working capital which has been fixed by the stockholders, only means that such part of its accumulated surplus shall be so distributed as the directors, in good faith, exercising a sound discretion, adjudge capable of being surrendered by the corporation to the stockholders without injury to its business, then it is manifest that no case, under the statute, is presented by the complainant's bill.

The very great difficulty of interpreting and applying our statute, in case the phrase "accumulated profits" is to be considered as meaning something different from the phrase "accumulated surplus," is illustrated in the case of *Park* v. *Grant Locomotive Works, 40 N. J. Eq. (13 Stew.) 114,* decided by Vice-Chancellor Van Fleet in 1885. In that case it was a contract and not a statute which had to be construed. The corporation was under a contractual obligation to distribute annually "all the net profits of the company," after the payment of taxes, insurance and expense of maintenance. The directors distributed $105,000 of profits, but retained $205,000, which the complainant sought to have divided according to the contract. The learned vice-chancellor held that the words "net profits," as used in the contract, did not mean "the whole sum as appearing as net profits on any annual statement if such sum represented securities taken by the corporation in the course of its business which were not yet due, but which could not be converted except at a price much less than that which the corporation had given for them," but, on the contrary, meant "net gains which had been actually realized or which could be quickly realized without loss by a sale of assets representing the profits." This case points out distinctly the difference between actual or realized profits and anticipated or earned profits, and supports the view that a contract or a statute which binds directors to charge their corporation with a debt to its stockholders, immediately payable in cash, because of the possession of net profits or accumulated profits, should be construed to have in contemplation profits which exist practically in cash, *i. e.,* in the form in which they must be paid out.

If a construction should be placed upon the phrase "accumulated profits" in our statute similar to that which was placed by Vice-Chancellor Van Fleet upon the phrase "net profits" in the contract which was before him in the above-cited case, then it seems to me in this case, and in large numbers of other cases which are liable to come up, a most delicate and difficult task will be assigned to the court of chancery, and the court of chancery will be asked to place itself in the seats of the directors and decide important questions relating to the management of their corporations, which, according to a well-settled principle, a court of equity invariably declines to consider or decide. In my opinion, it was the intention of the act of 1901 to so amend the law of the state that a majority of the stockholders of a corporation could exercise the power, in a certain specified way, of preventing any one stockholder from bringing a vexatious suit whenever the annual balance sheet showed accumulated profits, and in such suit casting upon the court of chancery the difficult task above referred to.

Viewing the situations to which any statutory rule for the distribution of the profits of corporations would be applicable, and especially the situation of these immense aggregations of capital invested in widely variant forms of property, often of fluctuating value, which long after 1866 began to come under the control of our corporation law, I think the conclusion is unavoidable that the legislature of 1901 recognized that the general rule prevailing in other jurisdictions should be adopted, or rather readopted, in New Jersey—the rule which allows the majority of the stockholders of a corporation, acting in good faith, to control the business of declaring dividends, and provides a means whereby such majority can limit the power of a single stockholder to sue for an annual distribution of "accumulated profits," as they are made to appear on paper, to cases of bad faith or gross abuse of discretion. This change in our law was made by transposing and altering the phraseology of the statute. Down to 1901 every statute made its rule as to annual dividends alterable by the corporation only as to the time in the year when such dividends must be declared. The plain grammatical meaning of the act of 1901 was in this respect changed, and, in my opinion, such

change was made for good reasons to carry out the legislative intent which I have indicated. This is not a case, it seems to me, where it is possible to conclude that, notwithstanding the change in the wording of the revised law, no change of the meaning of the law was intended.

4. The question is now presented whether, in the case of this defendant corporation, the statutory rule governing the distribution of dividends has in fact been displaced by inconsistent rules in the amended certificate of incorporation, or in a by-law adopted by a majority of the stockholders. It appears distinctly from the bill of complaint (see particularly paragraphs 2 and 3) that the defendant corporation was organized subject in all respects to the amended law of 1901. I think, in the absence of any allegation to the contrary, the fair inference from the bill is that the amended certificate of incorporation was filed before any of the capital stock, including that portion which the complainant now holds, was issued. The bill does not in terms allege that the by-laws of the corporation which it sets forth were adopted by a vote of the majority of the stockholders, but under well-settled rules of pleading I think that the bill must be deemed to admit that these by-laws were enacted in that way. The bill alleges that the by-laws were passed by the corporation, and that they "are said to do away with the effect of section 47" of the Corporation act, as amended in 1901. After reciting the by-laws, the bill undertakes to show that the same "are not effectual to accomplish the purpose for which they are said to be intended," and then proceeds to state the reasons why they should not be deemed effectual to that end. There is no suggestion that the by-laws did not displace the statutory rule because they were not adopted by a vote of a majority of the stockholders. No such claim has been made in the elaborate and minute argument, oral and by brief, submitted on behalf of the complainant. Upon the perusal of the bill it is evident that there is no intention to claim on behalf of the complainant that the by-laws were inefficient to accomplish their purpose because they were not adopted by a majority vote of the stockholders. This is not a case where, in the absence of a specification in the demurrer, an objection to the bill is excluded from consideration.

This is a case where the presumption *contra preferentem* is applied in accordance with common sense to exclude from consideration a case which manifestly the bill does not intend to present.

I do not stop to see whether the inference should be drawn from the bill that these by-laws were adopted prior to the original issue of the complainant's stock. The bill does not allege that either the amended certificate or the by-laws came into existence after the stock had been issued. The matter hardly seems worth consideration, because the complainant's stock was beyond all doubt issued subject to the provisions of the act of 1901, and, under the construction which I have placed upon that act, was subject, in respect of the declaration and payment of dividends, to such rules displacing the statutory rule as the requisite majority of the stockholders might thereafter see fit to lay down by means either of an amended certificate of incorporation or a by-law.

The amended certificate provides as follows:

"The board of directors shall have power from time to time to fix and to determine and to vary the amount of the working capital of the company; and to direct and determine the use and disposition of any surplus or net profits over and above the capital stock paid in; and in its discretion, the board of directors may use and apply"

any such surplus or accumulated profits in purchasing or "acquiring its bonds or other obligations, or shares of its own" capital stock, to such extent and in such manner and upon such "terms as the board of directors shall deem expedient."

The sections of the by-laws which we have to construe, and which are set forth in the bill of complaint, are as follows:

"Section 5. Dividends. The board of directors may declare dividends from the surplus or net profits of the company.

"The dates for the declaration of dividends upon the preferred stock and upon the common stock of the company shall be the days by these by-laws fixed for the regular monthly meetings of the board of directors in the months of April, July, October and January in each year, on which days the board of directors, in its discretion, shall declare what, if any, dividends shall be declared upon the preferred stock and the common stock, or either of such stocks.

"The dividends upon the preferred stock, if declared, severally and respectively, shall be payable quarterly, upon the fifteenth day of May, of August, of November and of February in each year.

"The dividends upon the common stock, if declared, severally and respectively, shall be payable quarterly, on the thirtieth day of June, of September, of December and of March in each year.

"If the date herein appointed for the payment of any dividend shall in any year fall upon a legal holiday, then the dividend payable on such date shall be paid on the next day not a legal holiday.

"Section 6. Working Capital. The directors shall not be required, in January in each year, after reserving, over and above its capital stock paid in, as a working capital for said corporation, such sum, if any, as shall have been fixed by the stockholders, to declare a dividend among its stockholders of the whole of its accumulated profits exceeding the amount so reserved, and pay the same to such stockholders on demand; but the board of directors may fix a sum, which may be set aside or reserved, over and above the company's capital paid in, as a working capital for the company, and from time to time they may increase, diminish and vary the same, in their absolute judgment and discretion."

I shall not undertake in this opinion, the limits of which have perhaps already been unnecessarily extended, to examine minutely the numerous clauses above set forth from the amended certificate, and from the by-laws, which relate to the declaration and payment of dividends. In my judgment, they fully cover the whole subject and displace the statutory rule.

5. An argument has been urged upon the court in favor of the complainant growing out of the existence of preferred stock and the relation of preferred stock to common stock in respect of the distribution of profits as dividends. It is claimed that the preferred stock, although cumulative, and thus intercepting all existing profits so far as may be necessary for the payment of past-due dividends, cannot in equity receive the benefit of an accumulation of profits which have been held back from distribution among the common stockholders. In other words, it is argued that directors have no right to accumulate profits, after satisfying the dividends which have accrued upon the preferred stock, and hold this accumulation as a guarantee fund to secure to the preferred stockholders their future dividends. It is insisted that the issuing of preferred cumulative stock has imposed upon directors of a corporation having both kinds of stock a special duty to the holders of the common stock which otherwise would not exist—a duty which may at times imperatively call

for the declaration of a dividend on the common stock, although in case there were but one kind of stock such dividends might, in the discretion of the same directors, be withheld.

I do not find it necessary to enter upon the consideration of the interesting questions which are thus suggested, because the bill does not charge that the directors of this defendant corporation are intentionally accumulating profits in order to benefit the preferred stockholders; nor does the bill allege any facts from which any such intent on the part of the directors to favor the preferred stockholders can be inferred, or any facts from which the inference could be drawn apart from the intent of the directors that the effect of this accumulation is not to accomplish a wise and useful purpose relating to the corporate business, but only to thus favor the preferred stockholders by supplying them with a so-called guarantee fund. Even conceding that the existence of two kinds of stock imposes upon directors some such special duty as that for which the complainant contends, it does not follow that directors are bound at all times or at stated times to pay out all profits which may be capable of application to dividends on the common stock, in payment of such dividends, in order to prevent the possibility of such profits being absorbed in the future by the preferred stockholders. Accepting the complainant's argument as sound, the conclusion would seem to be substantially to this effect: that while directors, in holding back profits for emergencies, or for use in the business of the corporation, or because they are not in a form to be distributed without loss, must have due regard to the equity of the holders of the common stock against the holders of the preferred stock which we are now assuming to exist, they are bound still to take care of the interests of the corporation, and those interests plainly are paramount to this alleged equity.

We have seen that the mere fact that earned profits, whatever they may be, and in whatever shape they may exist, remain undistributed to the extent of six per cent. of the capital stock of the corporation is not of itself significant of any improper refusal of the directors to declare and pay a dividend out of this fund. The bill, yielding to the fallacy which consists in considering

$66,000,000 absolutely as an immense sum of money, argumentatively

"insists that the large accumulation of surplus and comparatively small rate of dividends heretofore paid on the common stock, and their subsequent reduction and final discontinuance, *indicate* a fixed policy on the part of the United States Steel Corporation to favor the interests of its preferred stockholders, to the detriment of its common stockholders, which the action of this court alone can remedy by directing the payment of a proper dividend from the surplus on hand in January, 1904, to the common stockholders of said corporation."

The bill does not allege a single fact which shows that the retention of these accumulated profits ($66,000,000), which, when expressed in terms of money, are in fact a small sum when compared with the capital of the corporation invested in its business, is not justified by the nature of the assets of the corporation in which the accumulated profits are invested and the requirements of the business operations of the company.

The demurrer will be sustained.