The three suits were tried together. They involve members of the same group and have for their object the winding up *Page 518 
of the affairs of the corporations and the distribution of their assets among the stockholders, upon the theory that the stockholders were partners doing business under corporate guise; and to place a receiver in charge. Each company is charteredinter alia to buy and sell real estate and was organized to develop adjacent tracts of land in Bergen county. The North Jersey Holding Company and the Queen Anne Park Holding Company have sold practically all their lots. The tracts of the first named were acquired on a $70,000 investment and it now has net assets of nearly $600,000, consisting of $32,000 cash; mortgages $573,000 and lot sales contracts $15,000. Its liabilities are nominal. The tract of the second named company was obtained on a $50,000 investment, and it now has net assets of $316,000, consisting of $45,000 cash; mortgages $211,000; lot sales contracts $6,000; accounts receivable $33,000 and lots unsold $19,000. Its liabilities are nominal. The assets of the Hudson-West Shore Realty Corporation amount to $112,000 and twenty acres of lots unsold. Its total liabilities are $15,000. Its acreage was acquired for a nominal sum subject to mortgage encumbrance of $191,000, on which there remains due $6,000. The enormous profits were made during the boom time in real estate, but they are paper profits, still to be realized. They would many times exceed the original investment were they liquid, and refusal to declare dividends to stockholders might be resolved as abuse of discretion and call for a mandatory injunction.
The failure to declare dividends in specie, were it within the power of the court to order dividends in kind (Laurel SpringsLand Co. v. Fougeray, 50 N.J. Eq. 756; Stevens v. UnitedStates Steel Corp., 68 N.J. Eq. 373) is not open to judicial criticism. Passing, as we are, through a period of severe financial depression with real estate values alarmingly deflated, the directors of the companies are wisely reserving their cash for apprehended emergency outlay in case of mortgage, taxes and assessments defaults by lot owners, and generally to maintain the integrity of their holdings. Further, the stockholders' common interest in all the securities, some good, others precarious, is not partible with assured *Page 519 
equality. The directors are without power to destroy the unity of interest of stockholders in corporate property by an allotment in kind against the will of a single member.
This litigation was precipitated by the shabby treatment accorded the complainant by his associates. He had furnished $40,000 of the $70,000 capital of the North Jersey Company; $40,000 of the $50,000 required for purchase of the Queen Anne Company tract, and $26,800 of the $34,000 capital required to promote the Hudson-West Shore Company. Gross and Altshul each furnished $10,000 of the capital of the North Jersey Company and $5,000 each towards that of the Queen Anne Company. That was in 1925. The promotors were Rosinoff and Levy. Their brains and labor plus the complainant's capital produced the enormous accumulations. Of the eighteen thousand eight hundred and thirty shares of the North Jersey Company, nine thousand four hundred and fourteen were apportioned to the complainant and two thousand three hundred and fifty-four to each of his four associates, giving them a majority of two shares. By agreement, the complainant, Gross and Altshul are to be repaid their capital investments upon liquidation of the assets, before distribution of profits. The complainant holds forty-five per cent. of the stock of the Queen Anne Company, Gross, Altshul, Rosinoff and one Reis holding the balance. In the Hudson-West Shore Company the complainant has a one-third interest — Rosinoff and Levy each holding equal shares.
The complainant had been director and treasurer of the three companies from the beginning until 1929, when he was unceremoniously dropped from both offices, and then he filed the bills charging his co-stockholders with conspiring to deprive him of his shares of the assets by the use of them in new purchases and developments of land, instead of dividing them upon the liquidation of the lands originally purchased, as he alleges was the understanding and agreement; it being his claim that as between the stockholders the relations were those of co-partners, and that the companies were created and used simply as media to carry on the co-partnership *Page 520 
enterprises in the management of which all were to participate. The complainant's status of minority stockholder and his deposition from office, thus excluding him from taking part in the management of the companies, are charged as part of the conspiracy.
There was no unlawful conspiracy. The complainant's minority stockholdings in the New Jersey Company were apparently brought about by his own cunning. It seems that a larger fraction of the capital stock than they got had been agreed upon should go to his associates; the four were to have each a sixth; but on the eve of closing the contract of purchase of company's acreage, the complainant hedged and refused to go along until they agreed to take an eighth, and in the pinch they submitted; and he still was short a majority vote. Had he miscalculated? Aged as he was, and as he pleads, he was not led into a minority holding by misleading promises of his associates to protect his interests, as he asserts. He was sixty-nine years, shrewd. In deposing him from office, the co-stockholders but exercised their statutory powers. In the majority, they lawfully elected their directorates and officers. The complainant had no vested right to office. It was unseemly and ungrateful to drop him but not unlawful; he suffered no loss of legal right. The elections in each instance were lawfully held and upon notice to him. He did not attend, but had he, the result would have been the same. His fellows had previously arranged to eliminate him; they all transferred their stock, except qualifying shares, to Altshul, in trust, who voted them. That proves design, not illegality.
There is no proof that the assets are about to be mishandled, or that they are to be used otherwise than in the prosecution of the lawful business of the companies.
It is not made out that the companies were created or adopted as convenient vehicles for limited adventures, and that the stockholders agreed to divide the profits when the assets — the lands — became liquid; and if there had been such object and agreements, the enforcement would violate the policy of corporate law and be a fraud on the statute. A *Page 521 
joint venture, with its personal responsibilities, cannot assume corporate garb, with its privileges and immunities, and again emerge as a joint venture; once taking on corporate form, adventure arrangements, inimical to corporate rules and statutory regulations, are abortive or supplanted. The applicable principles are set down in Jackson v. Hooper, 76 N.J. Eq. 592,
and in Loomis v. Public Service Transportation Co.,102 N.J. Eq. 259. The companies have unlimited life and to decree the enforcement of agreements such as set up by the complainant would be to dissolve them in a manner not sanctioned by law.Riker Son Co. v. United Drug Co., 79 N.J. Eq. 580. That relief is denied.
Declarations of dividends out of profits rest with the board of directors, and in the absence of abuse of discretion equity will not interfere. P.L. 1926 p. 541; Park v. Grant LocomotiveWorks, 40 N.J. Eq. 114; Blanchard v. The Prudential InsuranceCo., 80 N.J. Eq. 209. As already indicated, the directors are presently well within the exercise of a sound discretion and relief will be reserved until there is a betterment. LaurelSprings Land Co. v. Fougeray, supra.
The fact that the certificate of incorporation of the North Jersey Holding Company provides that its profits may be reinvested in real estate, does not enlarge its powers nor render it immune from declaring dividends when appropriate; i.e., distributable profits cannot be held indefinitely nor for remote and indefinite prospects of reinvestment.
The complainant has also an equity to have returned to him: his capital investments. Inter sese the stockholders, they were virtually loans or advancements to the companies, to pay the purchase price of their lands, and though the contract for preferential payment was between stockholders it reflects the complainant's equity. To retain all the profits for reinvestment, excessive as they are, would be a badge of fraud. It is but fair that the capital investment be repaid at an early day, consistent with the companies' financial capacity, and the bills will be retained to await the event. *Page 522