10 Buch.        Blanchard v. Prudential Ins. Co. of America.

Leon F. Blanchard et al., complainants-respondents,

v.

The Prudential Insurance Company of America et al.,
defendants-appellants.

[Argued November 29th, 1911.   Decided April 26th, 1912.]

1. *P. L. 1907 p. 140 § 12*, required domestic insurance companies to
elect whether they would conduct a participating or non-participating
policy business.  A domestic insurance company, which was issuing or-
dinary policies entitling the holder to participation in profits, and which
had put nearly all of its industrial non-participating policies on a basis
of participation in profits by means of cash dividends and surrender
values, elected to carry on a non-participating business and to discon-
tinue the issuance of participating policies, and thereafter its directors
in good faith made a concession to all holders of industrial policies, in-
cluding policies issued after the statute, by adding about ten per cent.
to the amount of insurance the same premium would pay, claiming that
such concession was only a return of excessive premiums, or a cost or
expense necessarily incurred in preserving its business.—*Held*, that the
sole intention of the legislature was to separate the two forms of in-
surance without reference to the methods adopted by companies in the
conduct of their business, and that the concession did not constitute the
doing of a participating policy business in violation of the statute.

2. *P. L. 1907 p. 132 § 1*, required insurance companies conducted on
the mutual plan, or in which the policyholders were entitled to share
in the profits or surplus, to annually ascertain the amount of surplus
to which participating policies were entitled, and to apportion to such
policies as a class the surplus so ascertained, and carry such amount as
a distinct liability to such class of policies on and for which it was ac-
cumulated.   Directors of a domestic insurance company, in compliance
with the statute, in February, 1908, ascertained the earnings on partici-
pating policies prior to December 31st, 1907, and apportioned a profit
of about $2,500,000 to the stockholders, and by resolution not affected
with fraud or bad faith placed that amount to its contingent surplus,
and deferred its payment until future action by the directors.—*Held*,
in view of the contingencies and liabilities of the company, that their
refusal to make a present distribution of such stockholders' dividends
was a matter of business discretion, and that equity would not interfere
by injunction to compel a present distribution.

3. In cases where the power of the directors of a corporation is with-
out limitation and free from restraint, they may reserve such profits
as may be necessary or judicious for repairs or improvements and to

14

meet contingencies both present and prospective, and thereby defer the distribution of dividends, and their determination to do so, if made in good faith, is final and not subject to judicial revision.

On appeal from a decree advised by Vice-Chancellor Howell, whose opinion is reported in *78 N. J. Eq. (8 Buch.) 471.*

*Mr. John R. Hardin* and *Mr. Robert H. McCarter*, for the complainants.

*Mr. Edward D. Duffield* and *Mr. Richard V. Lindabury*, for the defendants.

The opinion of the court was delivered by

KALISCH, J.

A bill of complaint was filed in the court of chancery against the Prudential Insurance Company by Leon F. Blanchard in behalf of himself and other stockholders of said company who might come in, to compel a distribution to them, by way of dividend, of an equitable portion of the surplus from accumulated profits amounting to $2,500,000, which had been alleged to be available for the purpose by the directors of said company and arbitrarily and illegally "in a way fraudulent in law and subversive of the rights of the stockholders not assenting thereto," withheld by them from the stockholders entitled thereto.

As incidental to this relief the bill prayed the aid of the court to prevent the company from making any payments and granting any benefits out of the surplus profits to policyholders in excess of their contractual rights.

The decree of the court of chancery directed a mandatory injunction to the directors of said company to declare a dividend to the complainants, and all other stockholders of that company, *pro rata* to their several stockholdings, of $2,500,000 from the surplus of the company. It denied to the complainants all other relief; and directed the payment of complainants' costs and counsel fee by the defendant company.

From that part of the decree directing the declaring of the dividend and to distribute the same to stockholders and the payment of complainants' counsel fees and costs by the defendant company, the defendants appealed to this court, upon the ground that the court of chancery should have dismissed the complainants' bill, with costs.

From that part of the decree denying all other relief to the complainants, the complainants appealed to this court, on the ground that the court should also have decreed that additional benefits applied to the policies issued by the defendant insurance company after the beginning of the year 1907, and before July 1st, 1909, made the policyholders holding said policies on the last-mentioned date participate, to the extent of such additional benefits, in the profits of the company's business contrary to the provisions of the act of the legislature of New Jersey (supplemental to the general law for the regulation and incorporation of insurance companies), approved April 15th, 1907; and that in determining the surplus of the company as a stock corporation the amount of such additional benefits should have been included in the profits of the company's business and added to said surplus as part thereof; and that an injunction should have been directed restraining and enjoining the defendant company from further payments to any policyholder holding a policy issued after the beginning of the year 1907, and before July 1st, 1909, in force on July 1st, 1907, to which said policyholder may not be entitled by the terms of the policy contract; and from in any way enlarging or changing the policy contracts issued within the period aforesaid, or at any time, in such way as to authorize or require the payment to a policyholder of any sum of money to which such policyholder would not be entitled under the terms of the policy contract, and from thereafter diverting further sums from the profits of said corporation by the payment of any sum or sums to which policyholders holding policies issued within the period aforesaid may not be entitled by the terms of their contract, and from further payment to policyholders of any sum or sums on policies issued prior to the beginning of 1907 by way of additional benefits to which the policyholders may not be entitled by the terms of the policy

contracts beyond additional benefits announced to such policies prior to the first day of July, 1909.

It developed upon the hearing that the company from the time of its inception until 1886, a period of nine years, issued what is generally known in the life insurance business as non-participating industrial policies only. These were plain ordinary policies of a fixed amount which required the payment of a fixed premium, and the holders thereof under their contracts with the company were not entitled to any rebates or dividends by reason of any profits the company might make in the transaction of the business, or to any participation in such profits.

In 1886 the company inaugurated a change in its business respecting the issuance of policies of insurance and began issuing what is termed ordinary policies, the greater number of which by their terms entitled the holders thereof to such dividends or participation in the company's profits as the directors might determine upon. This course of business was pursued until January, 1897, when the company adopted a scheme by which it granted concessions to the holders of industrial policies by giving to them a *post-mortem* dividend after five years, a cash dividend after fifteen years, and establishing a surrender value after twenty years. This in effect made all the industrial policies outstanding at that time participants in the profits of the business, and thus nearly all the policies outstanding at that time, both ordinary and industrial, on a participating basis.

This situation remained unchanged until by virtue of section 12 of an act of the legislature of 1907, page 133, the company was put to its election of conducting its business either as participating or non-participating. And in pursuance of this section the company passed a resolution July 8th, 1907, electing to carry on the non-participating business and to discontinue the issuing of participating policies August 1st, 1907. On June 14th, 1909, the board of directors, by resolution, made a concession to the holders of all industrial policies issued on and after July 5th, 1909, not by reducing the premium, but by adding about ten per cent. to the amount of insurance that the same premium would thereafter purchase.

A similar concession was likewise extended to the holders of

all industrial policies which were issued after January 1st, 1907, and in force on July 1st, 1909. Such concessions appeared to have been made by the company in 1880, 1885, 1891, 1897 and 1906.

Complainants insisted in the court below and now urge that the action of the board of directors by extending these increased benefits to all industrial policies issued since the beginning of the year 1907 and in force on July 1st, 1909, was and is in contravention of the act of 1907 under which the company had elected to do a non-participating business, and violative of the contractual rights of policyholders, who, by their policies are entitled to participate in the profits of the company, as well as of the rights of the stockholders, in that it diverts large sums of money from the profits of the company by making the concessions to its policyholders not entitled thereto, and the effect of which is to reduce the profits of the company, in which the participating policyholders and the stockholders are entitled to share. And it is further claimed that these concessions on the part of the company are tantamount to the doing of a participating business and therefore are wholly unauthorized.

The defendant company meets this charge with the claim that it had been its practice to make such concessions as are now for the first time being objected to, at irregular intervals (the years in which they have been made has been before stated), and they justify it upon an apparently sound and substantial basis, the main reason for such action, on the part of the company, being, that in fixing the premiums to be paid for insurance such fixed premiums had to be in their very nature experimental in order to guard against any possible loss and to protect the fund accumulated for the benefit of the policyholders, in that, in case of an emergency, it would be able to meet the demands which should be made upon it, i. e., policies becoming payable, to meet the expenses and costs not only of conducting but also extending the business. The premiums were therefore fixed high enough to insure against any possible loss.

As a result, the company necessarily from a business point of view and intentionally charged the industrial policyholder more for his insurance than it was worth—that is, more than it cost to

carry it. The main cause for this was that it was impossible to foresee how much it would cost. Business caution rendered it necessary to take into account the fluctuation in the rates of interest which was likely to occur, the uncertainty as to the number of policies which would lapse from one cause or another, and above all the uncertainty of the extent of mortality among its policyholders. An estimate of what a fair premium should be based upon such contingencies is, in its very nature, largely speculative. Besides, another important element which entered into the fixing of the premium was the cost of obtaining the business and preserving it. The business, as it developed, demonstrated that the premiums charged and paid were excessive. Now, it is this excess of premium, this ascertained overcharge, which the company claims it returns to the policyholders by the methods which have already been adverted to. It is further claimed by the defendant company that these excess of premiums are not to be regarded in any sense as profits, because unless policyholders were relieved from paying the excessive premiums and were put upon the same basis with other policyholders who had been carrying and were carrying like sums of insurance, for a lower rate they would allow their policies to lapse and seek other companies for insurance, and that therefore these concessions were to be considered rather in the nature of cost and expense necessarily incurred in preserving its business and meeting competition, than a participation by policyholders in the profits of the business. In effect, it is contended that it is a business method adopted by the company as conducive to the well being and prosperity of the company and its policyholders, and that in making these concessions the directors were acting in good faith.

It becomes of vital importance, in order to ascertain the true meaning of the act, to keep in view the real nature of the business conducted by domestic life insurance companies doing business in this state prior to its passage. For it may be safely assumed that the legislature intended to differentiate between what are termed participating and non-participating business. As has already been observed, the defendant company had issued policies by which its policyholders paying a fixed premium were entitled to participate in the profits and were what is known as dividend-

paying policies, and straight out or ordinary policies, by which its policyholders paid a fixed and stated premium without any regard to the profits made by the company. To this latter class of policyholders, however, as has been already stated, the company had, prior to the act of 1907, made concessions at irregular intervals as the business conducted by it warranted and to meet competition with other companies which the future stability and prosperity of the company demanded.

In order to ascertain the true meaning and spirit of the act of 1907, we must have recourse to what the business conditions and methods of doing business by domestic life insurance companies doing business in this state actually were up to the time of the passage of said act. This information is sufficiently gleaned from the history of the defendant company, of its life and progress, from its inception to the present time. The salient features of its business were the issuing of two classes of policies—participating and non-participating. Both classes of policies were the creatures of express contracts made between the company and the policyholders. Those policyholders who, by their policies, were entitled to participate in the profits were not dependent upon any bounty or gracious act of the company, but were solely entitled to do so by virtue of the contractual relation which existed between them and the company. The right to share in the profits of the company by the participating policyholders was not affected by any fluctuation of the profits, for if there was any profit, they were entitled to share in it. It appears that the concessions were infrequently made. From the time of the company's organization up to 1907, five such concessions, as are complained of, were made by the company to the policyholders. The first four concessions were made at intervals of five and six years, and it appears that none was made from 1897 until 1906.

It is, therefore, extremely unlikely that this feature of the company's method of conducting its business was within the contemplation of the legislature when the act was passed. The twelfth section of the act requires the board of directors by resolution "to elect whether it will carry on its business in the form of participating business or non-participating business," and then concludes, "and it shall not be lawful for such company to thereafter

conduct both the participating and non-participating forms of
life insurance."

What the legislature manifestly had in view was the character
of the business conducted by domestic insurance companies, and
not the business methods adopted by them in the conduct of such
business.

It was the business of participating and non-particiating forms
of life insurance with which the legislature dealt. Both forms of
life insurance constituted the business which the company con-
ducted and both kinds of insurance were subjects of contractual
relations between the company and the takers of policies. Nothing
can be clearer than that it was the sole design of the legislature to
separate the two forms of life insurance business and to compel
such life insurance companies to elect to conduct either form, but
not to conduct both.

The defendant company concedes that it having elected to do a
non-participating business, it is, therefore, not authorized to con-
duct a participating form of insurance business. The complain-
ants maintain that the concessions made by the company to its
policyholders, though made at irregular intervals, is practically
the doing of a participating business. We cannot accede to this
for the reasons already pointed out. It was not in any sense a par-
ticipation in the profits. Participation in the profits by the con-
tractual relation imports a right to and a certainty of participa-
tion in the profits, if there are any, and in nowise is made
dependent upon an act of grace. The concessions made appear to
have been a necessary outlay from the earnings of the company
which must be considered as entering into the cost of conducting
the business, and though, as a result, the profits are diminished
and policyholders receive the benefit of such concessions, it is not
tantamount to a participation in the profits. Net profit is the
gain which remains after all the costs and expenses of the busi-
ness have been paid. Whether the company should have made or
make these concessions involves a purely business proposition.
Upon what business basis the company has made these concessions
has already been amply shown. While these transactions may be
the subject of legislative control they are clearly not amenable to
judicial supervision. Judicial interference can only be invoked

when it appears that some clear statutory policy or some legal rule has been violated. No claim has been made that the directors in making these concessions acted fraudulently or in bad faith. It seems, to us that the making of these concessions was purely a business matter which called for the exercise of the sound discretion of the directors of the company. They have exercised it and there is nothing before us to show that they have not fairly exercised such discretion. It seems to us that it would have been unconscionable on the part of the directors when, from statistics and from actual experience, they had ascertained that the premiums which had been fixed and paid by policyholders of straight-out policies were unreasonably excessive, for the insurance which they carried, for them to have converted such excess of premiums into profits and continued to exact the same, instead of returning such excess of premium in some shape or other, to the policyholders who had paid them. It seems rather more consonant with business probity, equitable principles, fairness and justness that those who have overpaid and who are overpaying for the insurance which they are carrying, should be made whole than that such excess of premium should be retained by the company to swell its profits for the benefit of the stockholders and for policyholders because contractual relations with the company entitle them to participate in the profits.

It is not in violation of the contractual rights of policyholders holding dividend paying policies, because their contracts are subject to the fair business methods adopted by the company to maintain its business, to expand it, and to use all other legitimate business means adopted by it to increase its stability and prosperity.

For the reasons given the decree denying the relief prayed for by the complainants is affirmed.

We now turn to a consideration of the appeal of the defendant company from that part of the decree directing it to distribute $2,500,000, by way of dividend, The fact has already been adverted to that prior to 1907, the company issued both participating and non-participating policies, and up to that period no apportionment was required by law, the surplus earnings of the company being carried in its general surplus until

the dividend period of the participating policy arrived. It has also been commented upon how in the course of the conduct of its business, the defendant designedly charged a high rate of premium for insurance, in order to meet every possible emergency that may arise, and how it had become the custom of the company at irregular intervals to return the excess of premium charged by it, to the policyholders. It is self-evident that in order to determine the cost of insurance it was necessary in the case of a stock company to determine how much should be paid to the stockholders for their investment, and very large profits were paid, until the $93,000, originally contributed, had increased to $2,000,000. The company subsequently adopted the policy of taking only ten per cent. of $2,000,000 each year, as representing the share of the stockholders. By section 1 of the laws of 1907 (*P. L. 1907 p. 132*), it is required that domestic insurance companies doing business in this state, conducted on the mutual plan or in which policyholders are by the terms of their policies entitled to share in the profits or surplus to annually ascertain the amount of surplus to which all such policies (participating policies), as a separate class are entitled and to

"annually apportion to such policies, as a class, the amount of surplus so ascertained and carry the amount of such apportioned surplus, plus the actual interest earnings of such fund, as a distinct and separate liability to such class of policies on and for which the same was accumulated."

It appears that in compliance with the provisions of the act, the defendant company on February 10th, 1908, made an apportionment of the surplus earnings which had accrued upon the participating policies prior to December 31st, 1907; and it further appears that the total earnings on such policies to the end of the year 1909, amounted to $40,765,214. The division made of this sum by the company was to set aside about $22,-000,000 to meet what were called deferred dividends on participating policies, nearly $5,000,000 to policyholders in the form of dividends and concessions; $10,000,000 was set aside for a contingency surplus, and over $3,000,000 went for the benefit of the stockholders. It appears that the exact total amount of

the earnings which was assigned to the stockholders during the three years out of the earnings of the deferred dividend policies, as their portion, was $2,429,655.95, which with interest on the investment amounted at the time of the decree to $2,536,722.69. It is in regard to this sum set aside for the stockholders and the refusal to distribute the same among them by way of dividend that has given rise to this controversy. The directors, it further appears, in setting aside these earnings for the benefit of the stockholders, accompanied it with a resolution that the same be added to the contingency surplus and not to be paid to the stockholder except by future action of the board. The complainants hold about twenty per cent. of the stock and insist that their share of $2,500,000 should now be distributed to them in the form of dividends. Since the capital stock of the company is only $2,000,000 this would amount to a dividend of over one hundred and twenty-five per cent. The defendant company claims that it is necessary to retain this fund in order that the solvency of the company may be amply secured. This at once gives rise to a question which appertains to the wisdom of business management and foresight and does not call for the interference of the court. The complainants are practically seeking to have the business management of a life insurance company put into the hands of the court. Upon what basic legal principle the court is asked to substitute its judicial sense for the business sense and discretion which must rest with the directors of the company, has not been made clear. The complainants do not claim that the directors, in their action, were actuated by a fraudulent or improper purpose. They do not seriously attack the good faith of the directors in passing the resolutions adding the earnings assigned to the stockholders to the surplus contingency fund. The burden of their complaint is that the directors are unnecessarily overcautious, because they say there is ample safety in the amount reserved and in the contingency surplus to guarantee the future solvency of the company. In the judgment of the directors it is not deemed sufficient. Out of more than $200,000,000, more than $150,-000,000, called the reserve, is held by the company in trust for the policyholders and is money held by it for the purpose of

meeting the contracts it has made as they mature by death. This fund is a sacred one for the benefit of its policyholders, and is not subject to be diverted from the purpose for which it was established, without a breach of trust on the part of the company. These large sums being represented in the shape of securities for the moneys received by the company must be invested, and it is a matter derived from every day observation that there are and will be fluctuations in value of securities and property in the market. And, therefore, the company for the protection of its policyholders and to ensure the meeting of its contractual obligations, retains more than this actual reserve, for securities may go down, property may decrease in value, and consequently how much this contingency surplus should be is a matter for the good judgment of the directors of the company. The directors in this case seem to have thought, and we cannot say unjustifiably so, that the nature of the company's business subjected it to additional hazards from earthquake, plague, war and other similar disasters. But it is claimed that the directors have exercised their judgment when they have set apart $2,500,-000 for the stockholders. We think not. The resolutions assigning the several sums to the stockholders, which aggregate the sum of $2,500,000, are conditional. The resolution must be read as a whole. Each resolution, where the assignment to the stockholders was made, reads thus:

"Resolved, further, that the amount so apportioned to the stockholders be held and added to the contingency surplus of the company and be not paid out to the stockholders in the form of dividends, or otherwise, except by the further action of the board."

Reading the resolution as a whole, the meaning is unequivocal to the effect that the amount set apart will eventually, if everything goes well, belong to the stockholders, but, in view of possible contingencies it should not be paid out to the stockholders *now* but should be retained for the purpose of making more secure the payment of the company's contracts with its policyholders, which may run from fifty to seventy-five years yet. And the reason that the directors may do this with propriety is that the company is handling for profit the money of the policy-

holders, and they are bound to see that the policyholders are protected. This sum of $2,500,000 belongs to the stockholders, only provisionally, in that it is subject to the risk of the business. The complainants' proposition contemplated the actual withdrawal from the company and from future possibility of its being reached for the protection of the policyholders, this whole sum of $2,500,000. It became, therefore, a matter of pure business policy, and the conservation of the sacred trust reposed in the directors, which called for the exercise of their highest and wisest discretion in dealing with the matter. The directors having exercised their discretion in the matter, their judgment is not open to a successful attack, unless it appears that it was the result of fraud or bad faith on their part. It was not seriously contended, on the part of the complainants, that the directors were actuated by fraud or bad faith. The vice-chancellor did not find that there was any fraudulent conduct or bad faith on the part of these directors. From the evidence before us, we do not find any fraud or bad faith on the part of the directors in refusing to distribute *now* the $2,500,000 among the stockholders. On the contrary, it seems to us that the directors, in order to protect the policyholders have exercised no more than that degree of wisdom, caution and foresight which was incumbent upon them in dealing with a fund in which thousands of poor persons and of limited means are vitally interested.

As to when and under what circumstances the court of this state will interfere with the exercise of the discretion of a board of directors in the conduct or managing of a business is not an open question.

The rule of law is well stated by Vice-Chancellor Van Fleet in *Park* v. *Grant Locomotive Works,* *40 N. J. Eq.* *(13 Stew.)* *114;* affirmed on opinion, by this court, in *45 N. J. Eq.* *(18 Stew.)* *244,* as follows: "In cases where the power of the directors of a corporation is without limitation, and free from restraint, they are at liberty to exercise a very liberal discretion as what disposition shall be made of the gains of the business of the corporation. Their power over them is absolute so long as they act in the exercise of their honest judgment. They may

reserve of them whatever their judgment approves as necessary or judicious for repairs or improvements, and to meet contingencies, both present and prospective. And their determination in respect to these matters, if made in good faith and for honest ends, though the result may show that it was injudicious, is final, and not subject to judicial revision." The same subject received consideration by this court in *Laurel Springs Land Co.* v. *Fougeray, 50 N. J. Eq. (5 Dick.) 756*, in an opinion by Mr. Justice Garrison, in which he clearly and tersely states the legal rule to be "that the authority of the directors is absolute so long as they act in the exercise of an honest judgment." This rule was followed with approval, by this court, in *Murray et al.* v. *Beatty, 79 N. J. Eq. (9 Buch.) 604*, at the last term, in an opinion by Mr. Justice Swayze.

We do not find that the conduct of the directors was not in the exercise of an honest judgment, and, therefore, that part of the decree directing the declaring of the dividend of $2,500,000 and to distribute the same to the complainants and other stockholders of the defendant company and to pay to the said complainants their costs and counsel fee of $5,000 each, should be reversed, with costs.

No. 66 (appeal of Prudential company)—

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, PARKER, BERGEN, VOORHEES, KALISCH, BOGERT, VREDENBURGH, VROOM, CONGDON, WHITE—12.

No. 67 (appeal of Blanchard)—

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, PARKER, BERGEN, VOORHEES, KALISCH, BOGERT, VREDENBURGH, VROOM, CONGDON, WHITE—12.

*For reversal*—None.