LEON F. BLANCHARD et al.

*v.*

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA et al.

[Submitted November 3d, 1910. Decided February 25th, 1911.]

1. A life insurance company may reduce its rates for future business, if the enterprise is not thereby endangered, by actual reduction or by increasing the amount of insurance purchasable for the same amount.

2. A life insurance company which under the election required by *P. L. 1907 p. 133 § 12*, elected to conduct a non-participating policy business, cannot give retroactive benefits to existing policyholders by a reduction in rates.

3. Life insurance being affected with public interest, the attorney-general can sue to enjoin *ultra vires* acts by a company engaged in that business, and that without a relator, but of his own motion.

4. A life insurance company will not be enjoined from engaging in *ultra vires* acts at the suit of a shareholder, where the pleadings do not present any issue on the facts relied upon.

5. A life insurance company is properly compelled to declare a dividend among its stockholders where funds held as a surplus appear to be unnecessarily and unreasonably held.

6. General Corporation act April 21st, 1896 (*P. L. 1896 p. 293 § 47*), as amended by act March 21st, 1901 (*P. L. 1901 p. 246*), governing declaration of corporate dividends, does not apply to life insurance companies.

7. Equity can compel a corporation to declare dividends where there is a sufficient surplus above the necessities of the corporate business, and dividends cannot be withheld fraudulently, arbitrarily, or unreasonably.

---

On final hearing. On bill, answer, replication and proofs.

*Mr. John R. Hardin* and *Mr. Robert H. McCarter,* for the complainants.

*Mr. Edward D. Duffield, Mr. Richard V. Lindabury,* and *Mr. John C. Spooner* (of the New York bar), for the defendants.

HOWELL, V. C.

The bill in this case was originally filed by Leon F. Blanchard for himself and other stockholders of the Prudential Insurance Company of America, who were similarly situated with him, to enjoin the company from carrying out a scheme whereby certain benefits were given to the holders of certain of its non-participating industrial policies, and to compel the company to pay to its stockholders such dividend out of its surplus as would be sanctioned by a judicial inquiry into the affairs and assets of the company. There are other forms of relief sought touching the payment of salaries and the expenditure of moneys in building operations, but the two grounds above mentioned are the only ones which were seriously litigated. The facts are voluminous and intricate and largely of a technical character, but as to those which are material to the decision of the points litigated there is but little variance.

After the cause was at issue, other stockholders were admitted, so that now the complainants are eighteen in number, holding somewhat more than twenty per cent. of the total share capital of the company. These additional complainants join in the prayer of the bill.

The company was organized under the name of "The Widows and Orphans Friendly Society," by a special act of the legislature of this state approved April 3d, 1873. Its name was changed to "The Prudential Friendly Society," by another special act in 1875, and again by a certificate pursuant to a statute then in force on March 30th, 1877, to "The Prudential Insurance Company of America.". It began business with a very small capital, which has been increased from time to time by the declaration of stock dividends from its accumulated surplus until at the time of the filing of the bill it had a capital of $2,000,000, divided into forty thousand shares of the par value of $50 each. It has paid to its stockholders a dividend at the rate of ten per cent. per annum for many years. At the beginning, and until 1886, it issued what is known as non-participating industrial policies only. These were policies issued for a definite and specified amount upon payment of definite and specified premiums, and the policyholders were not entitled by the terms of their contracts

to any rebates, dividends or other participation in such profits as the company might make in the transaction of the business. By 1886 the financial standing of the company had become so well established that it began issuing what is called .ordinary policies, the great majority of which by their terms entitled the holders to such dividends or participation in the company's profits as the directors might determine upon. There was a class of these policies by which the holder was entitled to participation in the profits at the end of certain periods of years, as, for instance, policies were issued which entitled the holder to a dividend not annually but at the end of each period of five years from the date of the policy, provided he was living at the end of the term. These are called deferred dividend policies.

In November, 1896, at a meeting of the executive committee, the president of the company explained and outlined a scheme for granting concessions, as they were called, to the holders of industrial policies by giving to them a post-mortem dividend after five years, a cash dividend after fifteen years, and establishing a surrender value for the policies after twenty years; whereupon a resolution was passed directing the officers to perfect and modify the plan in their discretion; and they were authorized to extend it to old policies as far as they considered it wise to do so. This committee appears to have made a report at a meeting of the board of directors on January 6th, 1897, and while the record (page 738) does not state that it was adopted, it appears to have been acted upon in such a manner as to make all the industrial policies outstanding at that time participants in the profits of the company. This action then put nearly all the policies of the company on a participating basis, and they remained so for a period of ten years. By section 12 of chapter 72 of the laws of 1907 (*P. L. 1907 p. 133*) every domestic stock life insurance company was put to its election whether it would carry on its business in the form of participating or non-participating business. This election was required to be made by a resolution of the board of directors to be filed with the commissioner of banking and insurance on or before September 1st, 1907, and it was provided that after December 31st, 1907, such companies should conduct only the kind of life insurance which they severally had so elected to

carry on, and should not thereafter conduct both the participating and non-participating branches of the business. In pursuance of this legislation, the company passed a resolution on July 8th, 1907, electing to carry on its business in the form of non-participating business, and providing that it should cease the issuing of participating policies on August 1st, 1907. At the time this election went into effect, the company had outstanding three classes of policies, to which frequent reference will hereafter be made—(1) industrial policies; (2) ordinary policies; (3) deferred dividend policies. By the term "ordinary policies," I refer to the various forms of policies issued from what has been called the ordinary branch of the business, and exclude industrial policies. These three classes of policies must, of course, remain participating policies, and their holders cannot be deprived of their right to participation so long as the present contracts are outstanding.

During the life of the company it has in several instances granted to its policyholders what it has denominated increased benefits under their policies, which are not called for by the terms of the contracts. These increased benefits consisted in enlarging the amount payable to the policyholder at maturity. The result was reached by an addition to the face of the policy rather than a reduction of the premiums, for the reason that a reduction of the premiums would run into fractions of a cent, which would be inconvenient, if not impossible, to handle and calculate in practice. Such concessions, as they have likewise been called, were made in 1880, 1885, 1891, 1897, 1899, 1906 and 1907. The officers of the company declare that the giving of such concessions or benefits is now and always has been the policy of the company; that when the company started business it was without accurate life tables as to industrial lives; that it fixed upon a table of rates which eventually turned out to be too high, and that inasmuch as the policyholder's money had created a fund that was larger than was deemed necessary to protect the company's obligations, they should be entitled to the benefit thereof by an increase in the face value of their policies. With this series of acts in mind, the board of directors, on June 14th, 1909, passed a resolution, the result of which was another concession or benefit to the industrial

policyholders, beginning with all industrial policies issued on and after July 5th, 1909, not by reducing the premium, but by adding about ten per cent. to the amount of insurance that the same premium would thereafter purchase. This particular concession or benefit was likewise extended to all industrial policies which were issued after the beginning of the year 1907, which should be in force on July 1st, 1909. Complaint is made of this by the bill (page 32) in these words:

"That methods and policies are devised by said directors and enforced by them, instituted and continued for the purpose of keeping down so far as possible additions to the profits of said corporation distributable to the stockholders thereof, and that such distributable profits have been distributed, and it is the avowed intention of the said directors to hereafter make further distribution thereof, to policyholders of said corporation not entitled thereto by their policy contracts, in large amounts, at the direct expense and to the direct injury of the stockholders of said corporation."

The reply of the answer to this charge is (page 13):

"Defendants also admit that the directors expect to make further distributions from the earnings on the non-participating policies that were issued prior to 1897 to the holders of such policies and say that this course is not only just and fair to the policyholders concerned and the stockholders as well but is essential to the continued prosperity of the company."

The complainants urge that the action of the company in conferring the benefit proposed by the resolution of 1909 is wholly void, for the reason that it contravenes the legislation of 1907, already referred to, under whose authority the company elected to do only a non-participating business, and that the granting of the benefit proposed is in effect permitting the future policyholders to participate in the profits contrary to the statute. It is obvious that there are two classes of policyholders dealt with; the one class comprise all the industrial policies which the company might issue after July 5th, 1909. The other class consists of those policies issued between January 1st, 1907, and July 1st, 1909, to which a retroactive benefit of the same character is given.

I have no hesitation in saying that it is entirely competent for the company, acting through its board of directors, at any time to reduce its rates of premiums for future business, and that its discretion therein is uncontrolled, except that it would not be permitted to reduce the rates so low as to endanger the whole enterprise. If, after long experience, the company finds that its rates are excessive, it is not only its right but its duty to reduce them to a reasonable basis. And this may be done either by an actual reduction of the whole table of rates of premium or by increasing the amount of insurance which the old rates will thereafter purchase. The new rate, or the increased amount of insurance, so far as this class of policies is concerned, would then become a part of the insurance contract and would operate to the extent to which the benefit is conferred as a reduction in the premium rates.

But as to the policies which receive the retroactive benefit the situation is different. A portion of these policies, that is to say, those issued between January 1st, 1907, and August 1st, 1907, are participating policies, all issued before the company elected to carry on a non-participating business only. There is another class, viz., those issued between August 1st, 1907, and July 1st, 1909, which were issued after the company's election, and are therefore non-participating policies. The question is then whether this class of policies can be granted the benefits proposed to be given to them. The argument is that no such benefit can lawfully be conferred upon them, for the reason that it gives them a benefit which they did not contract for and to the extent of such benefit makes them participate in the profits of the company's business, in the face of the fact that it was not lawful for the company to conduct a participating business.

Whether the complainants are in a position to succeed on this point or not is difficult of solution. It was argued on behalf of the defendants that concessions of this sort had been so frequent and so much money had been paid away in pursuance of them (about $12,000,000 in all), without any complaint on the part of the stockholders, that the directors might assume that the stockholders would be estopped from objecting in the present case. The stockholders filed their bill on June 23d, 1909, before

the plan went into operation, and the record shows that they applied by an interlocutory petition for an injunction to prevent its consummation, which was denied; hence it cannot be said that there was any delay which would defeat their suit. The statute which compelled the election and forbids participating business to be thereafter done does not give to stockholders, as such, any right of action growing out of its violation; neither does it provide any penalty therefor. The bill does not present any sharp issue on the facts out of which the point is developed, and the answer as to its allegations respecting the same refers only to the expectation of the directors to carry out the promises of the company touching the non-participating policies issued prior to 1897. The action of the company concerning the class of policies now under consideration cannot be said to be fraudulent or inimical to the interests of the company or its business as a whole, and in the absence of the statute, the discretion of the directors to do the act complained of would probably not be inquired into or interfered with, and therefore it may well be that the question is one that can be best dealt with on information filed by the attorney-general to restrain the violation of a statute for which no other remedy exists which is so appropriate and adequate.

That the business in which the defendants are engaged is affected with a public interest, and that the attorney-general may move the court in his official capacity to enjoin *ultra vires* acts is plainly decided by the case of *McCarter* v. *Firemen's Insurance Co., 74 N. J. Eq. (4 Buch.) 372;* and it is quite as clear that he may proceed on his own mere motion without a relator. *Attorney-General* v. *Delaware, &c., Railroad Co., 27 N. J. Eq. (12 C. E. Gr.) 631.* An injunction may likewise be awarded to shareholders to prevent a company from engaging in *ultra vires* acts when the pleadings are so framed as to raise the issue properly. In this case, however, there is no allegation in the bill of the precise fact relied upon nor any issue touching the same made up by the answer. In this state of the pleadings a court ought not by its decree to affect or disturb a series of insurance contracts extending over a period of nearly two years and aggregating possibly many hundreds of thousands of dollars.

The next question is whether the company shall be compelled by the decree of this court to pay a dividend to the stockholders, and, if so, at what rate. The decision of this question does not compel an investigation into the affairs of the company prior to the legislation of 1907, at which time it had outstanding a considerable amount of insurance represented by deferred dividend policies. By chapter 71 of the laws of 1907 it became the duty of the company annually to ascertain the amount of surplus to which all such policies as a separate class were entitled and annually to apportion to such policies as a class the amount of the surplus so ascertained and carry this amount plus actual interest earnings and accretions as a distinct and separate liability to such class of policies on and for which the same was accumulated; and the company was not permitted to use any part thereof for any purpose other than the purpose for which it was accumulated. This act went into effect on April 15th, 1907, and therefore became operative upon the company's business for that year. On February 10th, 1908, the directors passed a resolution reciting that whereas the actuary of the company had reported to the board that the total undivided profits or surplus derived from deferred dividend policies amounted on December 31st, 1907, to the sum of $15,616,716.52, and that in the opinion of the board it was necessary that there should be retained from the said surplus or profits the sum of $7,600,000 to be held by the company as a contingency surplus for the protection of its obligations and the security of its business, and that said sum should not be at that time assigned, and that the balance of said surplus or profits amounting to $8,016,716.52 should be assigned and apportioned between the deferred dividend policyholders and the stockholders, it was resolved that this last named sum of $8,016,716.52 be apportioned between the deferred dividend policyholders and the stockholders as follows:

"To the policyholders 90 per cent., amounting to the sum of $7,215,-044.87, and to the stockholders 10 per cent., amounting to the sum of $801,671.65; and the board does hereby ascertain and apportion to such deferred dividend policies as a class the said sum of $7,215,044.87, to which sum the said policies as a class are in the opinion of the board now entitled, said sum to be carried to the credit of said policies as a class as provided by law."

"*And be it further resolved*, That the said sum of $801,671.65 hereby apportioned and assigned to the stockholders be held and added to the contingency surplus of the company and be not paid out to the stockholders in the form of dividends or otherwise except by the future action of the board."

I may say that the division of the surplus derived from the deferred dividend policies into the three amounts above mentioned is wholly arbitrary. The actuary of the company stated that the first division whereby $7,600,000 was retained as a "contingency surplus" was recommended by him on what he considered to be an equitable basis, and the division of the remainder between the deferred dividend policyholders and the stockholders was fixed at ninety per cent. and ten per cent. respectively because a company which dealt in industrial insurance in London had with apparent success adopted those proportions for the same or similar purposes. Resolutions in like form, but with differing amounts, were passed with relation to this subject covering the business of the company for 1908 and 1909, so that out of the earnings of the deferred dividend policies for the three years mentioned there was assigned to what was called "contingency surplus" $10,512,065.23; to deferred dividend policies the sum of $21,866,879.82, from which should be deducted a difference between interest on the fund and payments out of it, leaving the sum of $20,605,119.08, and to the stockholders the sum of $2,429,655.95, which was increased by interest on the investments of the fund to $2,536,722.69; this last amount being the aggregate amount assigned to the stockholders during those three years, but concerning which it was resolved that the same be added to the contingency surplus and not paid to the stockholders except by future action of the board.

In my view the decision of the point now under consideration depends upon the effect which shall be given to that portion of the three annual resolutions which assign specific and certain sums to the stockholders. In one paragraph of the resolution there is a complete and perfect transfer, "to the stockholders ten per cent., amounting to the sum of," &c. If the resolution had stopped there I have no doubt but that those words would be sufficient to justify the officers of the company, without further action of the board, in dividing that sum as a dividend

among the stockholders. It is an assignment and transfer of a fund not needed in the business of the company and therefore set apart as profits to the owners of the stock. The paragraph following directs that this sum be added to the contingency surplus of the company and be not paid to the stockholders in the form of dividends or otherwise except by the future action of the board; and now the question is, whether having declared the ownership of this large sum of money to be in the stockholders, there exists or ever did exist any valid reason for withholding it from them or any valid reason why it should be paid into the fund called contingency surplus and retained there to await the future action of the board. If such good reason exists the fund must continue to be held in the contingency surplus. If it does not exist the money must be divided among the shareholders. I am unable to see that the words "contingency surplus" have any particular meaning. I do not understand that any separate account has been opened on the books of the company which contains entries touching this surplus. It is simply surplus, and nothing less or more, and the giving to it of this name neither adds to nor takes from its real character as part of the company's surplus. It may be said that the general surplus of the company, as reported to the various insurance departments at the end of 1909, was upwards of $16,000,000, and while an attempt was made on the part of the company to show that the actual free and unassigned surplus was $6,000,000 or thereabouts, I shall assume that it is what the company has stated it to be in its official reports. Of this amount upwards of eleven millions of dollars consist of cash in hand or in bank.

There does not appear to be any statutory provision either in the charter or in any general statute which controls the question of the declaration of dividends by this company. The forty-seventh section of our General Corporation act does not apply. As it stood at the time of the organization of the company (*P. L. 1866 p. 1034*) it applied only to manufacturing corporations, and in its present form it applies only to corporations organized under the General Corporation law. We are therefore remitted to the general principles which underlie corporate action in this regard, having in mind all the circum-

stances surrounding the case as presented. The cases in our own state to which the attention of the court has been called are cases involving the construction of the statutes referred to, the ones prior to the statute failing to exhibit the point now before us. In the cases construing the statute there is a large discussion of the general principles, and therefrom we may deduce a trend of judicial and professional thought which may lead us to the true principle. I gather from the whole discussion the rule that a court of equity may entertain a bill to compel a corporation to declare dividends in cases where there is a sufficient surplus over and above the necessities of the corporate business and that dividends may not be withheld either fraudulently, improperly, arbitrarily or unreasonably. In *Laurel Springs Land Co.* v. *Fougeray, 50 N. J. Eq. (5 Dick.) 756,* the court of errors and appeals held that the power of the court of chancery to order the directors of a trading corporation to make a dividend of unused profits when they improperly refused to do so is undoubted. In *Stevens* v. *United States Steel Corporation, 68 N. J. Eq. (2 Robb.) 373,* this court (Vice-Chancellor Stevenson) held that the subject was one concerning which the corporations are invested with a wide discretionary power, but that this discretionary power was not absolute, and that when the directors improperly refuse to make a division of unused profits a court of equity will interfere on behalf of any stockholder who may complain. And again in *Griffing* v. *Griffing Iron Co.* the same doctrine was approved by Chancellor Magie; and in *Murray* v. *Beattie Manufacturing Co.* (MS. opinion by Vice-Chancellor Stevenson), it is stated that while the distribution of the profits of the corporation in dividends is largely within the discretion of the directors, a court of equity will interfere to compel a distribution of profits which have been unreasonably and improperly withheld, and that this was substantially a statement of the original equitable rule in regard to the power of this court to compel a corporation to distribute profits unreasonably withheld. One of the replies to this position is that the by-laws of the company adopted on August 12th, 1907, exonerate the company from obedience to any such rule. One of these by-laws provides that the directors shall not be required, in January of

31

each year or at any other time after reserving over and above its capital 'stock paid in as a working capital for the corporation' such sum, if any, as shall have been fixed by the stockholders, to declare a dividend among the stockholders of the whole or any portion of its accumulated profits exceeding the amount so reserved and pay the same to such stockholders; but that the board may from time to time declare and pay to the stockholders, from the surplus or net profits of the corporation, such dividends, if any, as they in their absolute judgment and discretion may determine.    If this by-law is a reasonable and proper exercise of the power of the company and is in all respects a valid regulation, does it apply to the case in hand? My judgment is that it does not, for the reason that the directors in the exercise of their undoubted control have already assigned to the stockholders a large sum of money which they withhold from the stockholders upon the ground that this amount is needed, not so much for the prosecution of the company's business as for the security of its contract obligations.    It has in hand for this purpose—(1) its capital of $2,000,000;    (2) the reserve required by law, calculated according to the most rigorous requirements of any of the states and aggregating on December 31st, 1909, upwards of one hundred and fifty-six millions of dollars; (3) an additional sum of $1,000,000 put up as a special reserve for the like security of its contracts; (4) the amount placed in what is called contingency surplus, aggregating upwards of ten millions of dollars; (5) the amount assigned for the protection of the deferred dividend policyholders, aggregating over twenty millions of dollars; and finally, (6) $2,536,722.69 assigned to the stockholders and by the same resolution placed in the contingency surplus fund.    The reason given by the officers for this great accumulation is that the company may be able to meet contingencies that may arise from earthquake, pestilence and other unforeseen and fortuitous circumstances, and so provide for the remotest contingent liability that the most lively imagination can conceive of.    The actuary, whose testimony struck me as that of a careful, practical and conscientious man, declined to go as far as did some of the other officers.    I gather from his testimony that if the two millions and a half and upwards which

was assigned to the stockholders were distributed among them, there would still be a sufficient surplus, in his opinion, to take care of all the ordinary contingencies, and at the same time provide for the expense of the new business which is being canvassed in the northwestern states and Canada.

I am of the opinion that the case made by the complainants therefore puts it upon the defendants to satisfy the court that after having made this assignment to the stockholders it was still necessary that the fund so assigned should be taken from them and added to the general surplus. If the money was needed there, why go through the operation of assigning it to stockholders at all? Why give with one hand and take away with the other? Why not make a single division of the fund earned by the deferred dividend policies between them and the general surplus, leaving the stockholders out of the calculation entirely? The assignment to them cannot be a mere idle motion; it must have been done for some purpose which the theory of the defendants' case does not explain. If they were to have no part or lot in the fund, why should they have been mentioned? No reason or excuse is given for placing this fund in the contingency surplus and withholding it from the stockholders except that the money may be needed at some time in the future to meet a line of contingencies which never yet has happened and which appear as contingencies to be very remote. Such action on the part of the company seems to amount to an arbitrary and improper withholding of profits from the stockholders, not for any illegal or immoral purpose, because I think the case exonerates the management from any charge of dishonesty or personal aggrandizement, but in order to retain possession of the fund and quiet a groundless fear that the money may some day be needed.

I do not see why the surplus cannot be divided among the stockholders to the extent of $2,500,000. A distribution of this amount would not, in my opinion, injuriously affect the company's actual assets or its credit as a sound financial institution, nor its current business.

The result is that the injunction prayed for will be denied and that the company will be ordered to divide the said sum of $2,500,000 among its stockholders.