JOSEPH P. SANDERS, EMIL SCHUMACHER, ERIKA R. DANA, IRENE SIEGEL AND KATHERINE F. SHADEK, ON BEHALF OF THEMSELVES AND ALL OTHER HOLDERS OF 6% NON-CUMULATIVE PREFERRED STOCK OF DEFENDANT, THE CUBA RAILROAD COMPANY, SIMILARLY SITUATED, PLAINTIFFS-APPELLANTS, v. THE CUBA RAILROAD COMPANY, DEFENDANT-RESPONDENT.

Argued January 30, 1956—Decided February 20, 1956.

*Mr. John W. Griggs* argued the cause for the appellants (*Messrs. Morrison, Lloyd & Griggs,* attorneys; *Mr. Charles E. Scribner* and *Mr. Bernard A. Feuerstein* of the New York Bar, of counsel).

*Mr. Donald B. Kipp* argued the cause for the respondent (*Messrs. Pitney, Hardin & Ward,* attorneys; *Mr. Roger C. Ward,* of counsel).

*Messrs. Bilder, Bilder & Kaufman* filed a brief *amicus curiae* (*Mr. Samuel Kaufman* and *Mr. John M. Kaufman,* of counsel).

The opinion of the court was delivered by

JACOBS, J. In the Chancery Division the parties made cross-motions for summary judgment; the defendant's motion was granted and the plaintiffs' motion was denied. The plaintiffs appealed to the Appellate Division and we certified under *R. R.* 1:10–1(*a*).

The plaintiffs (excluding Joseph P. Sanders who has disposed of his stockholdings) are the holders of 750 shares of the 6% non-cumulative preferred stock of the defendant The Cuba Railroad Company, a New Jersey corporation. The company has outstanding 100,000 shares of the preferred stock and 700,000 shares of common stock with no par value. All of the common stock is held by Consolidated Railroads of Cuba, a Cuban corporation; the New Jersey

corporation and the Cuban corporation have the same directors. Since 1933 no dividends have been paid on the preferred stock although annual earnings were in excess of $600,000 in each year from 1941 through 1948 and in 1951 and 1952. The net income for the aforementioned years was reserved by the defendant's board of directors as working capital and was apparently used in the business of the corporation. At the end of the fiscal year 1953 the defendant's earned surplus was in excess of $15,000,000; since then it has declined and its published annual report for 1955 indicates its earned surplus to be $12,225,000.

In 1951 the defendant addressed a communication to its preferred stockholders which embodied a plan for the exchange of preferred stock for cumulative income debentures and accrual certificates; the plan never became effective and was abandoned by the defendant for want of approval by the required percentage of preferred stock. However, in its communication the defendant had stated that, because of the unsettled legal questions involved, it did not admit that the holders of the preferred stock had "any equity with respect to the Company's past earnings"; subject to the foregoing, it then presented a computation showing the equity per share of outstanding preferred stock in the earned surplus of the company "if such equity were to be computed on the basis of the difference between the dividends actually paid in any year and the amount of net profits realized in such year limited by the maximum of $600,000 but without regard to debits and credits to surplus and without regard to the amount reserved by the Board of Directors for working capital." In their complaint the plaintiffs set forth the foregoing and sought judgment: (a) determining and declaring the rights of the plaintiffs and the other preferred stockholders, and the extent of such rights to accumulated dividends and their equity in earned surplus in preference to the common stock, and (b) fixing the amount now due to the preferred stockholders for accumulated dividends and ordering the defendant to pay such amount into court for distribution to the plaintiffs and other preferred stockholders.

In its answer the defendant denied that the plaintiffs were entitled to any dividends not declared by the board of directors. It set forth Article IV of its amended certificate of incorporation which provides, in part, that the holders of preferred stock "shall be entitled to receive from the net profits arising from the business of said corporation in each fiscal year, after reservation of such sum, if any, as shall have been fixed as a working capital, as provided in the Certificate of Incorporation of said corporation, a noncumulative dividend up to, but not exceeding, six per cent." It also set forth Article VII of the original certificate of incorporation which provides, in part, that the directors are given the power to fix the amount to be reserved from time to time as a working capital before declaring a dividend among its stockholders and that "all amounts so reserved may be applied from time to time to the acquisition of property, as the directors shall from time to time determine, and neither the property of any description so acquired, nor any of its capital stock taken for any debt due the corporation, shall be regarded as accumulated profits, for the purpose of declaration or payment of dividends, unless otherwise determined by the directors." In paragraph 18 of its answer the defendant stated that pursuant to approval obtained at a 1940 stockholders' meeting and in accordance with Articles IV and VII, the defendant's board of directors has "annually reserved its entire net profits as a working capital and has employed the same in the retirement of outstanding mortgage and pledge indebtedness, in maintaining and repairing rolling stock and equipment and in purchasing new rolling stock and equipment." In paragraph 19 it stated that commencing with the fiscal year ending June 30, 1941 and thereafter up to and including the fiscal year 1953 the plaintiffs or their predecessors in interest had received notice that the board of directors had reserved the annual net profits as a working capital and were employing such net profits as aforesaid; that during that period the defendant had realized "aggregate net profits of $16,908,690.16 before debits or credits to earned surplus, and an aggregate of $15,014,639.57

after reflecting the net of such debits and credits"; and that "during the same period \$11,808,724.41 was spent to retire \$12,775,000 of indebtedness, and \$19,567,738.45 was spent on additions to capital, less borrowings."

In the Chancery Division, Judge Grimshaw found that since the plaintiffs merely questioned the business judgment of the board of directors but did not make any charges of "dishonesty or fraud" he would not be justified in ordering a dividend payment as sought in paragraph (b) of the plaintiffs' prayer for relief. See *Casson v. Bosman,* 137 *N. J. Eq.* 532, 535 (*E. & A.* 1946); *Murray v. Beattie Manufacturing Co.,* 79 *N. J. Eq.* 604, 610 (*E. & A.* 1911). This holding is not now questioned by the plaintiffs and is not encompassed in their appeal. With respect to paragraph (b) of the prayer for relief Judge Grimshaw stated that he was "somewhat at a loss" as to what the plaintiffs desired; he then said:

"If, as I think, they want this court to determine by way of a declaratory judgment the value of their equity in the present surplus of the defendant company, they are seeking something which they cannot get. The earned surplus is not a fixed amount. It may grow larger or smaller, depending on the needs of the business. A calculation of plaintiffs' interest in that surplus at this time would be simply an idle arithmetical exercise in which the court will not indulge.

On the other hand, it may be that the plaintiffs seek a declaratory judgment as to their rights in the event that the directors move to declare a dividend on the common stock. So far as the record shows, no such action is contemplated. But should it be, the rights of the preferred stockholders are not open to question. They have had consideration in a number of cases and a rule of conduct for the guidance of directors has been announced. *Moran v. [United States] Cast Iron Pipe, [& Foundry] Co.,* 95 *N. J. Eq.* 389 (*Ch.* 1924), affirmed 96 *N. J. Eq.* 698 (*E. & A.* 1924); *Agnew v. American Ice Co., supra* [2 *N. J.* 291]. Further comment by me is unnecessary."

█ The rights of the holders of the non-cumulative preferred stock rest generally (apart from statutory restrictions) upon the terms of the defendant's certificate of incorporation.

See *Ballantine, Corporations,* 516, 517 (1946). Those terms conferred priority rights over common stockholders when there were annual net profits from which dividends could properly be declared. *Agnew v. American Ice Co.,* 2 *N. J.* 291, 298 (1949). If there were no such profits in a given year, then no dividends could be paid to the preferred stockholders with respect to that year, then or thereafter. If, however, there were such profits the board of directors still had broad discretionary power to withhold any declaration of dividends and retain the profits as part of the corporation's working capital. If during a later year the corporation earned net profits and its board of directors wished to declare dividends to both the non-cumulative preferred stockholders and the common stockholders, the question would then be presented as to whether the preferred stockholders were entitled to receive the earlier dividends (which were passed though they could have been paid from the annual net profits) before the common stockholders received any dividends. This question finds neither a clear nor a specific answer in the defendant's certificate of incorporation, and its determination, in an appropriate case, will involve full consideration of the precise language of the certificate and the present scope and effect of New Jersey's so-called "Cast Iron Pipe Doctrine" or dividend credit rule. See *Bassett v. United States Cast Iron Pipe & Foundry Co.,* 74 *N. J. Eq.* 668 *(Ch.* 1908), affirmed 75 *N. J. Eq.* 539 *(E. & A.* 1909); *Moran v. United States Cast Iron Pipe & Foundry Co.,* 95 *N. J. Eq.* 389 *(Ch.* 1924), affirmed 96 *N. J. Eq.* 698 *(E. & A.* 1924); *Day v. United States Cast Iron Pipe & Foundry Co.,* 95 *N. J. Eq.* 389 *(Ch.* 1924), affirmed 96 *N. J. Eq.* 736 *(E. & A.* 1924); *Cintas v. American Car & Foundry Co.,* 131 *N. J. Eq.* 419 *(Ch.* 1942), affirmed 132 *N. J. Eq.* 460 *(E. & A.* 1942); *Agnew v. American Ice Co., supra; Dohme v. Pacific Coast Co.,* 5 *N. J. Super.* 477 *(Ch. Div.* 1949). *Cf. Ashley, The Future of the Law of Non-Cumulative Preferred Stock in New Jersey,* 5 *Rutgers L. Rev.* 358 (1951); *Note, Non-Cumulative Preferred Stock Dividends—The Persistence of the New Jersey Rule,* 11

*U. Pitt. L. Rev.* 301 (1950); *Note, Judicial Elaboration of the Dividend Credit Theory in New Jersey,* 24 *Temp. L. Q.* 69 (1950).

It may be acknowledged that New Jersey's dividend credit rule has not generally been accepted by the other states or in the federal courts. See *Wabash Railway Co. v. Barclay,* 280 *U. S.* 197, 50 *S. Ct.* 106, 74 *L. Ed.* 368 (1930); *Joslin v. Boston Maine R. R.,* 274 *Mass.* 551, 175 *N. E.* 156 (*Sup. Jud. Ct.* 1931); *Norwich Water Co. v. Southern R. Co.,* 11 *Va. L. Reg. N. S.* 203 (1925); *Note, Dividend Credits for Non-Cumulative Preferred Stock,* 17 *U. Chi. L. Rev.* 740 (1950); *Note, Rights of Preferred Stockholders as to Passed or Accumulated Dividends in Going Concern,* 27 *A. L. R. 2d* 1073, 1116 (1953). In the recent case of *Guttman v. Illinois Central R. Co.,* 189 *F. 2d* 927, 930 (2 *Cir.,* 1951), *certiorari* denied 342 *U. S.* 867, 72 *S. Ct.* 107, 96 *L. Ed.* 652 (1951), Judge Frank expressed the view that nothing in the terms of the ordinary non-cumulative preferred stock contract points to "a contingent or inchoate right to arrears of dividends" and that the contrary notion is an invention "stemming from considerations of fairness, from a policy of protecting investors in these securities." There seems to be little doubt that equitable factors did play a significant part in the development of New Jersey's doctrine. In the *Wabash Railway* case, *supra,* Justice Holmes stated that there was a common understanding that dividends which were passed (though there were profits from which they could have been declared) were forever gone insofar as non-cumulative preferred stock was concerned; but he referred to no supporting materials and there are those who have suggested a diametrically opposite understanding. See *Lattin, Non-Cumulative Preferred Stock,* 25 *Ill. L. Rev.* 148, 157 (1930). This much is quite apparent—if the common stockholders, who generally control the corporation and will benefit most by the passing of the dividends on the preferred stock, may freely achieve that result without any dividend credit consequences, then the preferred stockholders will be substantially at the mercy of

others who will be under temptation to act in their own self-interest. See *Note, Dividend Rights of Non-Cumulative Preferred Stock*, 61 *Yale L. J.* 245, 251 (1952); *Note, Right of Non-Cumulative Preferred Stockholders to Back Dividends Earned But Unpaid*, 74 *U. Pa. L. Rev.* 605, 608 (1926). While such conclusion may sometimes be compelled by the clear contractual arrangements between the parties there is no just reason why our courts should not avoid it whenever the contract is silent or is so general as to leave adequate room for its construction. In any event, New Jersey's doctrine has received wide approval in legal writings and there does not seem to be any present disposition in this court to reject it or limit its sweep in favor of the Supreme Court's approach in the *Wabash Railway* case. See *Frey, The Distribution of Corporate Dividends*, 89 *U. Pa. L. Rev.* 735, 750 (1941); *Berle, Non-Cumulative Preferred Stock*, 23 *Col. L. Rev.* 358 (1923); *Lattin, supra.*

■ The contention has been made that recent judicial expressions indicate that we have limited our dividend credit doctrine to instances where the undistributed profits have been retained in a cash or other readily convertible account and that it is not to be applied where they have been turned into working capital and have actually been used in the corporation's normal business operations. See *Agnew v. American Ice Co., supra,* 2 *N. J.,* at 303; *Dohme v. The Pacific Coast Co., supra,* 5 *N. J. Super.,* at 491. *Cf. Lich v. U. S. Rubber Co.,* 39 *F. Supp.* 675 (*D. C. D. N. J.* 1941), affirmed 123 *F. 2d* 145 (3 *Cir.,* 1941). However, in none of the New Jersey cases was the issue involved and we do not believe that it should be determined abstractly in the instant proceeding. In the *Dohme* case, *supra,* the Chancery Division, evidently relying on a casual statement in the *Agnew* case, *supra,* did state that where the earnings are used for legitimate corporate purposes such as payment of debts, reduction of deficits, and capital improvements, "the inchoate right of non-cumulative preferred stockholders in such funds is lost or terminated." In contrast, however, the Chancery Division also quoted approvingly from *Berle,*

*supra,* where the author, in discussing the New Jersey doctrine, stated that whatever part of the dividend has been earned less whatever dividend has been declared and paid or set apart upon the non-cumulative preferred stock, "although it may be used in the corporate business," must be segregated on the books for the benefit of such preferred stock and may not be distributed as dividends to the common stock. Similarly, in his discussion of the true dividend credit type of non-cumulative preferred stock, Ballantine has pointed out that "it should not affect the dividend credit how such profits may be employed in the business so long as they are not lost, nor whether they are 'segregated in a reserve fund.'" *Ballantine, supra,* 521. *Cf. Frey, supra,* 752, 753. It would appear evident that if a contrary position is taken, then the board of directors may largely nullify the effectiveness of the dividend credit doctrine by its manner of handling annual profits which have been earned but have not been declared as dividends on non-cumulative preferred stock. See *Ashley, supra; Note, Claim of Noncumulative Preferred Shareholders to Payment of "Passed" Dividends Before Current Dividends Are Paid to Common Stockholders,* 27 *Col. L. Rev.* 53, 59 (1927).

The cited New Jersey decisions which dealt with the dividend credit rule were injunctive proceedings in which allegedly improper dividends were about to be distributed. In the instant matter there is no suggestion that any dividends are about to be declared or distributed nor is any injunction or other coercive relief sought; the sole relief which the plaintiffs seek (as expressed in the concluding paragraph of their brief in this court) is that the judgment in the Chancery Division be modified "to provide that summary judgment be granted in favor of plaintiffs as to their preferential dividend rights over the common stockholders and that the amount of such preference is $9,535,000," subject to a possible offset and adjustment. We agree with the Chancery Division that the plaintiffs are not entitled to any declaratory judgment as to the "value of their equity in the present surplus of the defendant com-

pany." That surplus is ever changing and has been considerably reduced since the institution of the Chancery Division proceeding; indeed, it may be wiped out entirely and no proper purpose would now be served by speculating as to the inchoate rights of the non-cumulative preferred stockholders in profits which may thereafter be accumulated. *Cf. Ballantine, supra,* 521; *Lattin, supra,* 159.

■ ■ The remaining question is whether the Chancery Division erred in declining to give a general declaration as to the nature of the plaintiffs' preferential dividend rights over the common stockholders. The defendant contends that such declaration would at best be an academic one and would not be grounded upon an actual controversy between the parties as contemplated by the Uniform Declaratory Judgments Act. *N. J. S.* 2*A* :16–50 *et seq.; New Jersey Turnpike Authority v. Parsons,* 3 *N. J.* 235, 240 (1949); *Proprietary Ass'n v. Board of Pharmacy of New Jersey,* 16 *N. J.* 62, 72 (1954). It asserts that since the single common stockholder (Consolidated Railroad of Cuba) has a vital interest in the matter, it should have been joined as a party (*cf. N. J. S.* 2*A* :16–56; *Finley v. Factory Mutual Liabilily Ins. Co. of America,* 38 *N. J. Super.* 390, 394 (*Law Div.* 1955)); and it urges that since the plaintiffs' notice of appeal was not filed within the 45-day period prescribed by *R. R.* 1 :3–1, and no application for extension was made within the 30-day period allowed by *R. R.* 1 :27*B,* their appeal should be dismissed. These matters need not detain us since we are satisfied that the Chancery Division in nowise exceeded its discretionary powers in declining to make the general declaration sought by the plaintiffs. Although a trial judge should not view a declaratory application with hostility, he does have discretion to decline to render a declaratory judgment which would not "terminate the uncertainty or controversy giving rise to the proceeding." See *N. J. S.* 2*A* :16–61. *Cf. National-Ben Franklin Fire Insurance Company v. Camden Trust Company,* 21 *N. J.* 16 (1956). Similarly, he may decline to render a declaratory judgment where important policy considerations dictate that

course. See *Proprietary Ass'n. v. Board of Pharmacy of New Jersey, supra,* 16 *N. J.,* at 71.

Judge Grimshaw pointed out that the plaintiffs were the holders of but a small fraction of the preferred stock and acquired their interests after the acts about which they complained had been approved by the stockholders generally. He further pointed out that the plaintiffs could readily seek relief whenever the directors moved towards the declaration of a dividend on the common stock, but that the record did not indicate that any such action was contemplated. We add that the record before us is very meager, consisting mainly of the pleadings, and contains little to indicate why the plaintiffs require a general declaration of their rights at this juncture or how they will be harmed by its denial. The ultimate development of New Jersey's dividend credit rule involves far-reaching public and private considerations and it seems to us that it would be prudent to await a proper proceeding where the distribution of dividends is sought to be compelled or restrained and a full and proper record may be made. We have concluded that under the particular circumstances presented, Judge Grimshaw's determination should not be disturbed and the judgment entered in the Chancery Division is accordingly:

Affirmed.

HEHER, J., concurring in result.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, OLIPHANT, WACHENFELD, BURLING and JACOBS—6.

*For reversal*—None.