58 N.J. Super. 37 (1959)
155 A.2d 304
HERMAN L. COHEN, ET AL., PLAINTIFFS,
v.
THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, A CORPORATION OF NEW JERSEY, DEFENDANT.
Superior Court of New Jersey, Chancery Division.
Decided October 30, 1959.
*40 Messrs. Meyers and Lesser (Mr. Samuel B. Lesser appearing), attorneys for plaintiffs.
Messrs. Stryker, Tams & Horner (Messrs. Josiah Stryker and Arthur C. Dwyer appearing), attorneys for defendant.
SCHERER, J.S.C.
The problem to be resolved in this case is one of first impression in New Jersey. The defendant, a mutual life insurance company, issued five policies of ordinary insurance on the life of the plaintiff Herman L. Cohen, which he still owns. They were issued between April 14, 1919 and December 26, 1930. The first two were 20-payment life policies, and the latter three originally were whole-life policies but later were converted at the request of the insured to 15-payment life policies. The policies all contain substantially similar benefit provisions and vary in face amount of insurance payable on the death of the insured from $1,000 to $12,500. All of the policies became paid up between April 14, 1938 and December 26, 1944. Dividends were paid on all policies while premiums were being paid and thereafter through the year 1945, but no dividend has been paid on any of the five policies since 1945.
The defendant issued two policies on the life of the intervening plaintiff Norman Hertz, which he still owns. Both were issued in February 1922 and were 20-payment life policies. They became paid up in February 1941. Dividends on these policies were also paid through the year 1945, but not thereafter.
Since the contentions of each plaintiff are the same, they will be dealt with jointly. They say that, since this is a *41 mutual company, all policyholders are entitled to participate each year in the earnings of the company, and that the defendant has breached the terms of its contracts with them in failing to pay dividends on their policies after 1945. Plaintiffs further say that defendant's practice of grouping its policies into numerous classes, for the purpose, among others, of determining what the policies contribute to divisible surplus and whether they are entitled to dividends, finds no support in the terms of the insurance contracts. They argue that it was, and is, an abuse of discretion for the directors of the defendant to vote for the payment of dividends to some policyholders, but not to all, and particularly the plaintiffs and others similarly situated. Plaintiffs seek judgment requiring the company to pay dividends upon their policies for the omitted years  during all of which years the company admittedly had divisible surplus and paid dividends to some policyholders  and refrain from omitting payments to them in the future in years when dividends are paid. Plaintiffs also seek an accounting.
There is no charge of any bad faith on the part of the defendant's directors, nor of any neglect of duty, but an abuse of discretion in the apportionment and allocation of dividends is alleged. Defendant admits the non-payment of dividends after the year 1945, but says that after that date the plaintiffs' policies did not contribute to the divisible surplus of the company and hence were not entitled to dividends. It declares that the directors each year, upon receipt of a detailed report from the company's actuaries and upon recommendation of the dividend committee of the board, determine what part of the company's annual net surplus shall be considered divisible surplus to be paid as dividends to policyholders. The company further says that each year its actuaries, after grouping all policies into classes, make a detailed study and examination of them and determine which policies have contributed to the divisible surplus for that year. Dividends are allocated to these policies, but not to the others. Such examinations and analyses, beginning *42 in the year 1946 and continuing to date, revealed to the company that none of the plaintiffs' policies had made a contribution to divisible surplus, but in fact were in a deficit position. The company determined, therefore, that no dividends could properly be allocated to those policies.
The testimony reveals that there are several hundred thousand policies situated similarly to those of the plaintiffs, and the face amount of insurance involved is over 650 million dollars. It is said that a disposition of this case adversely to the defendant will not only affect existing contracts amounting to many hundreds of millions of dollars, but will disturb the methods and bases upon which business transactions have heretofore been conducted by mutual life insurance companies for over 75 years and will cause great confusion and disorder to the system under which this business has been conducted. If, however, the principle used in the dividend allocation is an incorrect one, the fact that it has been used for such a long period will not prevent the court from according relief to these plaintiffs. The mere fact that the plaintiffs have only seven policies out of many millions is unimportant if their cause of action is a just one. The courts must always be available to accord justice to all persons alike, and to remedy wrongs, regardless of the economic, social or other status of the persons involved. This has been a basic concept of our system of jurisprudence for centuries. See Magna Charta; 11 Am. Jur., Constitutional Law, sec. 326, p. 1121.
Dividends paid by mutual life insurance companies differ in concept from dividends paid by ordinary business corporations. The latter represent a return to the stockholder upon his investment. They are similar, however, in that the amount paid is discretionary with the corporation's board of directors both as to time and manner of payment. 13 Am. Jur., Corporations, sec. 645, p. 637; Murray v. Beattie Manufacturing Co., 79 N.J. Eq. 604 (E. & A. 1912); Sanders v. Cuba Railroad Co., 21 N.J. 78 (1956). In a mutual life insurance company, however, the dividend *43 represents a return to the policyholder of that portion of his premium which the company does not need to cover the actual cost of furnishing the insurance. This principle is aptly stated in Rhine v. New York Life Ins. Co., 273 N.Y. 1, 6 N.E.2d 74, at page 76 (Ct. App. 1936):
"`Under such mutual plan, in order to provide for unforeseen contingencies, the premium to be paid by the member is fixed by the company at an amount somewhat in excess of that which the company anticipates will be necessary in order to cover the cost of furnishing the insurance. The member pays that amount for the insurance in advance but later receives back such excess payment, if any, as a dividend, and thus gets the insurance at actual cost.'"
Since the factors upon which premiums are calculated vary with different forms of insurance and groups of policyholders, the amount which the company anticipates will be necessary in order to cover the cost of furnishing insurance over the actual realized cost will vary. The apportionment must be based upon calculation each year of the actual cost of furnishing the particular insurance provided for by each policy. Accordingly, the defendant, in apportioning divisible surplus, ascertains the amount which each policy contributes to that surplus and then distributes it in the same proportion as the policyholders have contributed to the surplus. In Rhine v. New York Life Ins. Co., supra, the court said, 6 N.E.2d at page 77:
"* * * Accordingly the defendant company and all other mutual companies, in apportioning divisible surplus, use the `contribution' method which aims to distribute the divisible surplus amongst policyholders in the same proportion as the policyholders by their payments have contributed to that surplus."
If there has been no contribution to divisible surplus, there is no dividend allocated.
The policy contains the entire contract between the parties (N.J.S.A. 17:34-15, subd. d). Certain clauses in life insurance policies are mandatory (N.J.S.A. 17:34-15), and the dividend clause is one of these. The section of *44 the statute concerning this is found in N.J.S.A. 17:34-15, subd. f, which provides:
"f. That the policy shall participate in the surplus of the company, and that, beginning not later than the fifth policy year, the company will, at uniform intervals, not less than one or more than five years, to be specified in the policy, determine and account for the portion of the divisible surplus accruing on the policy, and that the owner of the policy shall have the right to have the dividend arising from the participation paid in cash at the end of the then current policy year; provided, no other dividend option given in the policy or in the dividend notice has been duly elected: and provided, that no part of any yearly premium on the policy for the ensuing policy year remains unpaid. The use of the last above proviso is optional with the company." (Emphasis supplied)
One policy of Cohen and both policies of Hertz contain dividend provisions which are not in the exact statutory language. These clauses state in part that "this Policy will be credited with a dividend from the surplus earnings of the Company as ascertained and apportioned by the Board of Directors." The three policies were issued between 1919 and 1922. The remaining four policies of Cohen, issued between 1923 and 1930, contain the statutory language in their dividend provisions: "Annually, during its continuance in force, the proportion of the divisible surplus accruing upon this Policy shall be ascertained and apportioned by the Board of Directors and credited to this Policy at the end of the policy year as a dividend." The remaining provisions of the dividend paragraph are not here important. The statute was in force when all policies were issued. No explanation is offered for the departure from the statutory language found in the earliest policies. In all cases, however, the clauses provide that the dividend shall be ascertained and apportioned by the board of directors.
While the language of the dividend clauses in the earliest policies differs from the mandatory statutory language, it cannot be construed to enlarge the plaintiffs' rights and does not appear to be in conflict with the statute. To the extent that the clauses may conflict with the statute, the *45 latter must control. Hollin v. Essex Mut. Ben. Ass'n, 88 N.J.L. 204 (E. & A. 1915). The rule is the same with respect to the statutory clauses required to be inserted in fire insurance policies. Herbert L. Farkas Co. v. N.Y. Fire Ins. Co., 5 N.J. 604 (1950); Steiker v. Philadelphia Nat. Ins. Co., 7 N.J. 159 (1951). Subsection f has its origin in L. 1907, c. 72, and has remained virtually unchanged in language  and entirely unchanged in substance  down to date through the several revisions of the statutes.
Plaintiffs argue that the provisions of the statute, as well as the policies, require that dividends be paid upon their policies as long as they are in force and the company has money available for dividend purposes, and that there is nothing in the policies which requires that they contribute to divisible surplus. They further say that the practice of the defendant in grouping its policies into classes, for the purpose of determining whether they have contributed to the divisible surplus of the company, and allocating dividends upon this basis is not proper. It is also charged that for the company to pay dividends on some policies  and, in particular, policies issued after 1945  results in discrimination against the plaintiffs, contrary to the provisions of N.J.S.A. 17:34-45.
While it is true, as the plaintiffs allege, that there is no specific language in the policies which permits such classification, there are no words which preclude it. This is an administrative procedure. It is implicit in the statute itself that this, or some similar, procedure must be followed to ascertain, as to each policy, "the portion of the divisible surplus accruing on the policy," as provided in subsection f. This could not be done without an actuarial computation. The defendant has some 34 million policies in force, a large part of which have been issued since 1935. Obviously, it would be impossible to analyze each policy each year for dividend purposes. So the defendant, like other mutual life insurance companies, divides its policies into classes for this purpose. It has some 80,000 such classes. In a reported *46 case, cited hereafter, there is the statement that in 1936 the New York Life Insurance Company had approximately 150,000 such classes. But, whether the number of classes be few or many, all of the leading mutual life insurance companies appear to use the principle of classification in computation and allocation of dividends. See Rhine v. New York Life Ins. Co., supra; Chastang v. Mutual Life Ins. Co., 147 Ohio St. 341, 71 N.E.2d 270 (Sup. Ct. 1947); Buford v. Equitable Life Assur. Society, 98 N.Y.S. 152 (Sup. Ct. Sp. Tm. 1905); Barnett v. Metropolitan Life Ins. Co., 258 App. Div. 241, 16 N.Y.S.2d 198 (App. Div. 1939), affirmed 285 N.Y. 627, 33 N.E.2d 554 (Ct. App. 1941); Grange v. Penn Mut. Life Ins. Co., 235 Pa. 320, 84 A. 392 (Sup. Ct. 1912).
The policies and the statute require that dividends shall be ascertained and apportioned by the board of directors. In carrying out their duties of ascertaining and apportioning the divisible surplus accruing on each policy, they have exercised this discretion by classifying policies according to fixed formulae, in order to determine the contribution made each year to divisible surplus by each policy. These classifications insure that all policies similarly situated will be accorded similar treatment. After the classifications are established, a certain number of representative policies in each class are analyzed each year and it is then actuarially determined whether such policies  and hence the class represented by them  have contributed to divisible surplus and, if so, what proportion thereof shall be allocated to such policies. If no contribution has been made, no dividend is paid. In the absence of proof of an abuse of discretion in adopting this method, or in carrying it out, and in view of the uniformity of its use throughout the life insurance industry, it cannot be said as a matter of law that the actions of the defendant here have been arbitrary, unreasonable or capricious.
The finding that the classification of the policies by the defendant was proper leads us to inquire why the class into which plaintiffs' policies have been placed has been found *47 not to have contributed to divisible surplus since 1945 and thus has not received any dividends. It must be remembered that no premiums have been paid on any of the Cohen policies since 1944, and none on the Hertz policies since 1941. This, of course, was in accordance with the contracts. After premium payments ceased, the only possible way that these policies could contribute to divisible surplus was by the earnings, if any, which the company obtained on the investment of the premiums which had been paid on the policies before they became paid up.
The defendant's position is that whatever earnings there may be on these sums are less than the amount required to be reserved each year to meet the fixed non-forfeiture values of the policies, and that therefore all of the policies are in a deficit position. For example, projecting the figures through the year 1959 on the Cohen $10,000 policy, which is a 15-payment life policy issued in 1930, we find that the sum of $7,759.33 has been paid in total premiums. To date, $493.40 in dividends has been paid on the policy, so that the net cash outlay has been $7,265.93. The cash surrender value of this policy through 1959 is $7,510 and, upon Mr. Cohen's death, his beneficiary will receive $10,000, the face amount of the insurance. Thus, if Mr. Cohen were to surrender the policy this year, he would receive a net gain of $244.07, and if the policy became a death claim the beneficiary would receive approximately $2,735 in excess of Mr. Cohen's net cash payment to the company. As against these possible surrender and death claims, the company has computed that through the year 1958 the asset share value of this policy was $7,111.40, but in order to provide adequate reserves the company has set aside $8,142.40. The deficit position of this policy is thus readily apparent. All of the other policies held by plaintiffs are in the same condition, varying, of course, in amounts, with the exception of one Cohen policy, which at the present time has a cash surrender value of $637.33 less than the total net cash outlay.
*48 The reason that the earnings on the sums deposited have not kept pace with the amount which the company was required to add to the non-forfeiture values was explained by defendant's chief actuary. These policies were issued during a period of low premium charges and high investment return. In the issue years, the defendant's return on its investments was between 4 1/2% and 5%. Since 1930, however, its investment return has decreased from a high of 4.99% in that year to a low of 2.70% in 1947. It climbed back to 3.58% in 1957, but in 1958 it declined again to 3.49%. The 1958 regression was due, according to defendant's testimony, to a decline in the return on investments and increases in tax burdens and the cost of doing business.
During the period while the plaintiffs' policies are in force, the defendant is committed by the provisions thereof to add 3 1/2% interest to the non-forfeiture values. Thus, while the defendant is adding 3 1/2% interest each year, it has, for the period from 1944, when the last of the policies became paid up, through 1956 and again in 1958, earned less than 3 1/2% on its investments. Only in 1957 did its rate of earnings exceed that figure, and in that year it was 3.58%. However, the above investment return figures are gross and there are certain charges to be made against these, so that the net in each of the years is less than the gross mentioned. These figures show why the plaintiffs', and similar, policies have not contributed since 1945 to divisible surplus.
As stated above, the premiums paid by the plaintiffs on the policies were at a low rate. Defendant's experience with these types of policies resulted in an increase in the premiums on policies written after 1935, a further increase in 1938, and another in 1942. The first of the policies written was that on Mr. Cohen's life, dated April 14, 1919. It was a 20-payment life policy in the sum of $1,000, and the premium was $28.17. Premiums on the same policy issued in 1959 to an insured of the same age Mr. Cohen was in 1919, with less favorable benefits and with a fixed interest rate of less *49 than 3 1/2%, will amount to $37.64 per $1,000. The factors above discussed are not the only ones which enter into the determination of whether a particular policy contributes to divisible surplus and is therefore entitled to a dividend, but are illustrative.
Defendant admits that it has issued 15- and 20-payment life policies since 1944 upon which dividends are presently being paid. It says that this comes about not only because of the payment of premiums on these policies, but also because their non-forfeiture benefits, being less favorable than those in plaintiffs' policies, require less reserves and they thus make a contribution to divisible surplus. If plaintiffs' position is correct  that all policyholders each year are entitled to participate in such dividend distribution as the defendant may make  the result will be that those policies which do contribute to divisible surplus will be required to relinquish part of their earnings in favor of policies in the class of the plaintiffs, which are in a deficit position and have not contributed to divisible surplus. Neither the statute nor the contract provisions require such a result. Rhine v. New York Life Ins. Co., supra, 6 N.E.2d at page 79.
Plaintiffs say that their contentions have been upheld by the decisions of the courts of last resort in Pennsylvania, California and Maryland, citing Grange v. Penn Mut. Life Ins. Co., supra; White v. Provident Life & Trust Co., 237 Pa. 375, 85 A. 463 (Sup. Ct. 1912); Benjamin v. Mutual Reserve Fund Life Ass'n, 146 Cal. 34, 79 P. 517 (Sup. Ct. 1905); and Mutual Fire Ins. Co. v. Jean, 96 Md. 252, 53 A. 950 (Ct. App. 1903). An examination of these cases fails to reveal any support for plaintiffs' position.
The Grange case is favorable to the defendant. It holds that the fixing of dividends is discretionary with the directors and that they can adopt the "contribution method" of allocating dividends. That is the method used by Prudential. In its opinion in the White case, decided shortly after Grange, the Supreme Court of Pennsylvania referred to *50 Grange, but rejected the insurance company's allocation of dividends because it had acted arbitrarily and had made no effort to ascertain by calculation the plaintiff's proper proportion of the company's net profits. Neither the Benjamin nor the Mutual Fire case deals with the problems here presented and is no aid to their resolution.
Plaintiffs point to the fact that the defendant has a large unassigned surplus for contingencies and argue that part of this should be used for dividend purposes. The amount of this surplus, as shown by the last statement in evidence for the calendar year 1957, was in excess of 197 million dollars. Presumably, the figure has increased since then. Plaintiffs argue that, since the directors have already set aside large sums for every conceivable contingency, there is no need to retain so large a sum in unassigned surplus and policyholders should be given the benefit of it. But, as stated above, the declaration of dividends is left to the discretion of the company's directors by statute and the insurance contracts, and there is no proof that there has been an abuse of that discretion. Further, when the amount of this reserve is viewed in the light of the fact that the company has in excess of 32 billion dollars of insurance in force and assets of over 14 billion, of which some 6 billion is invested in stocks and bonds and 6 billion more in mortgages, it cannot be said as a matter of law that the retention of a large unassigned surplus is unreasonable or arbitrary. See Barnett v. Metropolitan Life Ins. Co., supra. When and under what circumstances the courts will interfere with the exercise of the discretion of the board of directors in the conduct or management of a business is stated in Blanchard v. Prudential Ins. Co. of America, 80 N.J. Eq. 209, 221 (E. & A. 1912), modifying 78 N.J. Eq. 471 (Ch. 1911), as follows:
"The rule of law is well stated by Vice-Chancellor Van Fleet in Park v. Grant Locomotive Works, 40 N.J. Eq. (13 Stew.) 114: affirmed on opinion, by this court, in 45 N.J. Eq. (18 Stew.) 244, as follows: `In cases where the power of the directors of a corporation *51 is without limitation, and free from restraint, they are at liberty to exercise a very liberal discretion as what disposition shall be made of the gains of the business of the corporation. Their power over them is absolute so long as they act in the exercise of their honest judgment. They may reserve of them whatever their judgment approves as necessary or judicious for repairs or improvements, and to meet contingencies, both present and prospective. And their determination in respect to these matters, if made in good faith and for honest ends, though the result may show that it was injudicious, is final, and not subject to judicial revision.' The same subject received consideration by this court in Laurel Springs Land Co. v. Fougeray, 50 N.J. Eq. (5 Dick.) 756, in an opinion by Mr. Justice Garrison, in which he clearly and tersely states the legal rule to be `that the authority of the directors is absolute so long as they act in the exercise of an honest judgment.' This rule was followed with approval, by this court, in Murray et al. v. Beatty, 79 N.J. Eq. (9 Buch.) 604, at the last term, in an opinion by Mr. Justice Swayze."
There is no allegation, much less any proof, in this case that there was any bad faith, willful neglect or abuse of discretion in the accumulation of the unassigned surplus, and the plaintiffs' argument that the surplus is excessive is not persuasive.
This same problem was discussed in Greeff v. Equitable Life Assur. Soc., 160 N.Y. 19, 54 N.E. 712, 715, at page 716, 46 L.R.A. 288 (Ct. App. 1899), and the Court of Appeals overruled the Appellate Division, which had directed the distribution of a similar surplus, and said:
"* * * No prudent person would be inclined to take a policy in a company which had so improvidently conducted its affairs that it only retained a fund barely sufficient to pay its present liabilities, and therefore was in a condition where any change, by the reduction of interest upon, or depreciation in, the value of its securities, or any increase of mortality, would render it insolvent and subject to be placed in the hands of a receiver. * * *."
This argument was also rejected in Buford v. Equitable Life Assur. Soc., supra.
Finally, the plaintiffs urge that the failure to pay them dividends represents discrimination against them, contrary to the provisions of N.J.S.A. 17:34-45. This statute is not applicable here. It is part of Article 9, entitled "Distinctions *52 and Discriminations," and merely states that there shall be no distinctions "between the insured of the same class" as to premium rates, dividends, or other benefits. All policyholders in the same class as the plaintiffs have been similarly treated. Further, this section has been held to be penal in nature and not to give rise to a cause of action on behalf of the plaintiffs. Rybasack v. Prudential Insurance Co., 15 N.J. Misc. 146 (Sup. Ct. 1937), affirmed 121 N.J.L. 583 (E. & A. 1939); Rybasack v. Travelers Insurance Co., 15 N.J. Misc. 266 (Sup. Ct. 1937); Metropolitan Life Ins. Co. v. Asofsky, 38 F. Supp. 464 (D.C.N.J. 1941); Uhlman v. New York Life Ins. Co., 109 N.Y. 421, 17 N.E. 363 (Ct. App. 1888). The penalties for the violation of the cited section are found in N.J.S.A. 17:34-46.
I find as a fact that plaintiffs' policies have not been classified by the defendant differently from other ordinary policies of the same class; that there is nothing in the insurance contracts themselves, nor in the statute, which precludes the separating of policies into classes for dividends or other purposes; that there has been no proof that the action by the board of directors of the defendant, in allocating divisible surplus during the years in which plaintiffs received no dividends, was arbitrary, unreasonable or capricious, or that the determination that plaintiffs did not contribute to divisible surplus was improper or erroneous. Under these circumstances, the plaintiffs, not having contributed to divisible surplus, are not entitled to participate therein.
These findings require a dismissal of the complaint, which will carry with it a dismissal of the demand for an accounting. It is open to serious doubt that a policyholder has the right to institute a suit for an accounting. It would appear that such an action must be brought by the Attorney General. See [McCarter] Attorney General v. Firemen's Insurance Co., 74 N.J. Eq. 372 (E. & A. 1909); Blanchard v. Prudential Ins. Co. of America, supra; Greeff v. Equitable Life Assur. Soc., supra.
*53 The plaintiffs' rights given by statute and the terms of the policies have not been infringed, nor has defendant breached the terms of its contracts with the plaintiffs. Plaintiffs having failed to sustain the burden of proof as to the allegations of their complaint, it will be dismissed, but without costs.
A judgment may be presented in accordance with these conclusions.